TEXAS TRACTION CO. et al. v. GEORGE et al. †

(Court of Civil Appeals of Texas. Dallas. May 4, 1912. Rehearing Denied June 8, 1912.)

1. MASTER AND SERVANT (§ 318*)—INJURIES TO THIRD PERSONS—INDEPENDENT CONTRACTOR.

Where a lighting company contracted for electric power from a traction company and agreed to place at its own expense in the traction company's substation, together with the necessary connecting apparatus, a pipe framework to carry the wires to be placed by it, and the only restrictions made by the traction company as to this framework was that it should conform in size and color to the framework already in the building, and the traction company exercised no control whatever as to the means employed or the employés engaged in doing the work, the relation between the two companies as to putting in the pipe framework was merely that of proprietor and independent contractor, and not that of master and servant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1257, 1258; Dec. Dig. § 318.*]

2. ELECTRICITY (§ 14*)—CARE REQUIRED—LIABILITY OF PROPRIETOR.

Where an employé of an independent contractor was killed by coming in contact with an electric wire after being warned that to touch it would kill him, and where the proprietor's substation, in which the accident occurred, was constructed according to the most approved standard, though the wire was not insulated because its insulation, while possible, was impracticable, and where at the time of the accident the substation, wires, insulation, and plant were in the usual and regular condition and being operated in the usual manner, all of which was known to the deceased, the proprietor was not chargeable with knowingly setting in operation causes dangerous to the deceased without exercising proper precaution to anticipate and prevent injury to him.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 7; Dec. Dig. § 14.*]

3. MASTER AND SERVANT (§ 318*)—INJURY TO EMPLOYÉ OF INDEPENDENT CONTRACTOR.

Where a lighting company engaged a hardware company to do certain plumbing in close proximity to an electric wire and was present by its agent supervising and directing how the plumbing should be done, it could not absolve itself from liability for the death of an employé of the hardware company by setting up that the hardware company was an independent contractor for injury to whose employés it was not responsible.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1257, 1258; Dec. Dig. § 318.*]

4. MASTER AND SERVANT (§ 280*)—ASSUMPTION OF RISK—SUFFICIENCY OF EVIDENCE.

In an action for death of a plumber by coming in contact with an electric wire, evidence *held* to show that at the time he undertook the work he knew of the dangerous conditions complained of as the negligent cause of his death, and therefore assumed the risk arising from such conditions.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 981–986; Dec. Dig. § 280.*]

Appeal from District Court, Collin County; J. M. Pearson, Judge.

Action by Mattie Pearl George and others against the Texas Traction Company and others. From a judgment for plaintiffs, defendants appeal. Reversed and rendered.

J. R. Gough and Garnett & Hughston, all of McKinney, and M. B. Templeton and T. B. Williams, both of Dallas, for appellants. Cockrell, Gray & Thomas, of Dallas, for appellees.

TALBOT, J. This suit was instituted by Mrs. Mattie Pearl George in behalf of herself and her minor children, J. R. George and Leslie N. George, against the Texas Traction Company, a corporation, and the Stark Grain Company, a partnership composed of J. T. Stark and L. B. Stark, to recover damages on account of the death of Larkin N. George, husband of Mrs. George and father of said minor children, alleged to have been caused by the negligence of the appellants. It is charged, in substance, that the Texas Traction Company owns and operates an extensive interurban railway system, extending from the city of Dallas, Tex., to Sherman, Tex., passing through the town of Plano; that the cars of said system are run and propelled by electricity generated, owned, and controlled by said Texas Traction Company; that said Texas Traction Company owns and controls several substations along its route, one of which is at Plano, Tex. It is further alleged that the Stark Grain Company undertook, along with its other business, to install and operate a system of electric lighting for the town and citizens of Plano; that in pursuance of said purpose and undertaking a contract was entered into by and between the said Texas Traction Company and the said Stark Grain Company, by which the former was to furnish and supply the latter, for a consideration, with electricity necessary for said lighting business; that, acting under said agreement, it became necessary to install certain transformers, a switchboard, and other electrical apparatus for the purpose of conveying the current of electricity from the power house of the Texas Traction Company for the use of the Stark Grain Company; that subsequently, on or about March 5, 1909, the defendant Stark Grain Company employed one T. E. Philpot, doing business under the name of Philpot Hardware Company, then engaged in the general plumbing business in Plano,

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

† Writ of error denied by Supreme Court.

to make certain plumbing connections on the substation of the Texas Traction Company; that this employment was had and the work done with the knowledge, acquiescence, and for the benefit in part of said company; that the representatives of the Texas Traction Company and the Stark Grain Company had previously conferred with each other as to the time and the manner of installing the transformers as set out under the terms of their agreement, and, in pursuance of the arrangement between them, the Stark Grain Company undertook to supervise and direct in detail the work being done by Larkin N. George. It is further alleged that George was a plumber and lacking in experience with electrical machinery; that the necessary plumbing connections were near certain wires heavily charged with electricity in the substation; that while in the performance of his duties, according to the directions and for the benefit of defendants, and while standing on a stepladder, without any knowledge of his own danger and without any fault on his part, "he came in close proximity to and contact with one of said deadly wires, producing such sudden and fatal shock that he met instantaneous death." The grounds of negligence alleged, and upon which the case was submitted, were: (1) That the defendants, knowing the dangers incident to the work of which the deceased was ignorant, failed to cut off, or provide any means for cutting off, the current of electricity during the performance of his work; (2) that the defendants employed him and permitted him to do his work without properly insulating the wires which killed him; (3) that they permitted him to do said work without any proper or adequate warning as to the dangers thereof; but that the Stark Grain Company, acting for itself and for the benefit of the Texas Traction Company, gave an inadequate, improper, and misleading warning to the deceased.

The defendants filed separate answers; the Texas Traction Company pleading the general issue and denying responsibility for the death of George on the grounds: (1) That there was no negligence so far as the Texas Traction Company was concerned; its plant, wires, and machinery all being constructed in the usual and proper way within its own substation, and that no duty devolved upon it to reconstruct its plant. (2) That deceased knew the deadly character of the wires, their location, and that the machinery was in motion, and assumed the risk of doing the work in which he was engaged when killed. (3) That he was warned of the danger by J. T. Stark, his employer, and that, even if J. T. Stark misdirected him or deceived him in respect to the deadly character of this wire, the Texas Traction Company was not responsible. (4) Contributory negligence. And (5) accident. The defendant Stark Grain Company pleaded a general denial, assumed risk, and contributory negligence on the part of the deceased, Larkin George; that said George, at the time of the accident causing his death, was in the employ of the Philpot Hardware Company, and not in the employment of defendants; that the said Philpot Hardware Company was an independent contractor engaged to do the work George was doing when killed; and that whatever work George did was done at the request of said Philpot Hardware Company in whose employ he then was. These defendants also adopted the allegations of the Texas Traction Company's answer not inconsistent with the defenses specially pleaded by them. A jury trial resulted in a verdict and judgment in favor of the plaintiffs against all of the defendants for the sum of $5,000, and, their respective motions for a new trial having been overruled, they appealed.

The first assignment of error urged by the appellant Texas Traction Company is that the "court erred in refusing the peremptory instruction requested by Texas Traction Company, because it was shown by the undisputed testimony, as well as by written contract, that deceased, George was not an employé of the Texas Traction Company, but that the Stark Grain Company was an independent contractor so far as this defendant was concerned, and that the deceased, George, at the time of his death was performing work either for the Stark Grain Company or the hardware company, and in any event not for Texas Traction Company."

At the time the accident occurred resulting in Larkin George's death, the Texas Traction Company owned and operated an interurban electric railway running from Dallas to Sherman, having a power plant at McKinney, halfway, and what is called a substation at Plano. The high voltage wires necessary to run the cars enter this substation, which contain machinery whereby the current is transformed so as to perform the service according to the recognized rules of electrical engineering. The Texas Traction Company, having a surplus amount of current, entered into a contract with the Stark Grain Company, whereby said grain company was given the right to connect in the substation, in order to use current for lighting purposes in the town of Plano. The substation referred to consists of a brick building about 40 feet square with high ceilings, cement floor, etc. The ticket office adjoins, separated by a middle sliding door, and on the outside next to the track is a double door leading into the machinery room. On the inside of the machinery room is certain electrical apparatus usual and necessary in the operation of an interurban electrical railway, and what is known as high-tension wires carrying about 18,000 or more volts of electricity coming out from the main power plant at McKinney go into this substation at a point high up next to the ceiling and then come

down into the electrical apparatus, etc. In the southeast corner of this large room, or near the corner, is located what is known as a "vault," being in fact a brick structure some 3 feet wide, 10 or 15 feet long, and about 6 feet high, inside of which are switches, etc., necessary to operate the plant. On the top of this vault is constructed a framework of iron piping running high up into the building from the top of the vault, and across which is strung, upon insulators, the high-tension wires, some 12, 15, or 18 feet above the floor. This pipe framework is constructed by upright piping running from each corner of the vault, so as to make a frame. Just west of and near to this vault is located some three or four transformers, which consist of large iron incasements some three or four feet in diameter, circular form, standing up about the height of the vault, and out of which wires run. There was an open space in the north end of this large room, about one-half of the room. Stark Grain Company was in the lighting business in the town of Plano, and, in order to procure current from the Texas Traction Company out of the substation so as to furnish electric lights in the town, it was necessary for it to place what is called a transformer in the machinery room to take the current, and, before the wires were connected, it was necessary that a pipe framework be erected north of the vault, which framework would be tied on or clamped to the pipe framing of the Texas Traction Company at the top of the vault on the north end, which is done by clamps, thereby holding it steady and firm. The contract between the Texas Traction Company and the Stark Grain Company was in the nature of a written proposal, accepted in writing by the Stark Grain Company, under date of December 7, 1908, and by its terms the Texas Traction Company agreed to provide suitable space in its substation at Plano for the Stark Grain Company to install the transformer and the other necessary electrical apparatus or machinery to procure the current of electricity desired for lighting purposes, and the Stark Grain Company agreed to pay the cost of such installation and to remove, at the termination of the contract, at its expense, all apparatus installed by it, and restore the traction company's property to its original condition. The contract specified the amount to be paid for the current to be thus furnished and stipulated that it should remain in force for the period of four years from January 1, 1909, unless otherwise terminated, as therein provided, and it was in force at the time George was killed.

The oral testimony bearing upon the relationship between the Texas Traction Company and the Stark Grain Company, and the particular proposition presented in the assignment under consideration, is too voluminous to be given in detail. A fair interpretation of it is that in the substation at Plano the Texas Traction Company has a surplus of electric power, and the Stark Grain Company, a lighting concern in Plano, desired to purchase and utilize current to be paid for by meter measurement when operation began. In order to furnish such current for lighting purposes, it was necessary for the Stark Grain Company to place in the machinery room an apparatus or transformer to reduce the current by what is called "induction." It was simply agreed that Texas Traction Company would furnish space in the room so that the grain company could place at its own expense its own apparatus or transformer; the exact location not being determined until the morning of or the day before the accident, but was then agreed upon. It was necessary that Stark Grain Company, in connection with its apparatus or transformer, put in a pipe framework in order to carry the wires when placed; the only requirements of the Texas Traction Company in this respect being that the pipe should, for the sake of looks, conform in size and color to the other framework already in the building. Stark Grain Company was to furnish its own apparatus, transformer, piping, etc., and was only to place the transformer at the place directed by the traction company, and on its own account to erect the pipe framework, which necessarily must be clamped to an upright framing already existing in the building over the north end of the vault, a brick structure some six feet high containing oil switches, etc. J. T. Stark engaged T. E. Philpot, doing business under the name of Philpot Hardware Company, a tinner and plumber, and explained just what he wanted, and they together planned as to the character of clamps necessary and proper to make the connections. George, an employé of Philpot, went to the building and helped to plan the framework, and undertook to do the job; he being a tinner and plumber by profession. This pipe framework was put together by him out of the building, and then with the assistance of J. T. Stark and Wyatt brought into the building and placed by them, when George proceeded to put on the clamps, thereby fastening the end of the pipe to the framework already in the building. To do this he used a stepladder. These connections were distant some 10 or 18 inches from the high-tension wires in the building. The work was not dangerous in itself, and the wires were harmless as straws—to use the words of a witness—unless touched, and it was not necessary to touch them in doing the work. Texas Traction Company had no control whatever over Stark Grain Company or the Philpot Hardware Company as to the means employed for the work, or the control or direction of any employé of either, but was only interested in the result of the work. Stark selected his own plumber, contracted for the price, and paid the same. It

is not shown that any employé or officer of the traction company, unless J. T. Stark may be considered its representative or employé, was in the building at the time, or knew that George was in the room or had anything to do with the work of installing the transformer or iron pipe framework.

[1] The first question is: Was the work of installing the transformer and of making the iron pipe framework connections, in the traction company's substation, which was undertaken by the Stark Grain Company, that of an independent contract so far as the traction company is concerned? We have reached the conclusion that this question should be answered in the affirmative. The testimony upon the subject was practically undisputed, and was to the effect as above stated. The doctrine of respondeat superior has no application to cases of independent contracts, and if we are correct in our construction of the evidence in this case, the Texas Traction Company was not the superior of either the Stark Grain Company, the Philpot Hardware Company, J. T. Stark, or the deceased, Larkin George. The work committed to the Stark Grain Company, or to J. T. Stark, representing that company, was not wrongful per se; nor was the work inherently dangerous. Neither did the injury to the deceased, George, which resulted in his death, proceed from the nature of the work itself, but from the manner in which it was executed by him. The Texas Traction Company did not retain a general control over the work of connecting up the framework in the substation, nor was this work done with reference to details according to their direction. With respect to the placing of the transformer in the substation, the officers of the Texas Traction Company simply directed where it should be located in the building, and the only thing required in reference to the framework to be constructed and installed by the Stark Grain Company was that the same should conform in size and color to the framework belonging to the Texas Traction Company already erected over the vault in the substation. This requirement "was simply to preserve harmony and as a matter of looks." The erection of this framework was a matter left to and undertaken solely by the Stark Grain Company; the Texas Traction Company only being interested in the result of the work and not as to the method or means by which it was accomplished. This being true, the relation existing between the Texas Traction Company and the Stark Grain Company was that of proprietor and independent contractor, and not that of master and servant.

[2] But appellees contend that, even though the Stark Grain Company was an independent contractor, yet the Texas Traction Company was not absolved from liability. This contention is based upon the theory or assumption that the work of connecting the iron pipe framework, which the deceased was doing at the time he met his death, was intrinsically and necessarily dangerous; that from its nature injury in its performance may have been reasonably anticipated, however carefully done; that the Texas Traction Company failed to discharge the duty resting upon it, under such circumstances, to take all reasonable precautions to anticipate and prevent such injuries to which the deceased was exposed, and therefore cannot shift liability to the Stark Grain Company or escape responsibility for such failure. In support of this view of the case, Cameron Mill & Elevator Company v. Anderson, 34 Tex. Civ. App. 105, 78 S. W. 8, and Kampmann v. Rothwell, 107 S. W. 120, are cited. We are of opinion that the case at bar is quite dissimilar in its facts from the cases cited. In Cameron Mill & Elevator Company v. Anderson, supra, it appeared that by permission of the city council the elevator company caused to be dug in one of the streets of the city of Ft. Worth, adjacent to its elevator plant, a hole some 34 feet long, 28 feet wide, and 12 or 14 feet deep. The excavation was left unguarded with no lights or barricades or signals about it, and the street was dark. Into this pit a boy of 13 years of age fell and was injured. The actual work of making the excavation was done by one McFadden under a contract with the elevator company by the terms of which he had exclusive control of the work. The boy had no notice of the excavation before he fell into it, and the elevator company did not know that it was not guarded or protected at night, and had never given the contractor any instructions upon that point, but understood that he was competent and experienced, etc. Under these facts, the Court of Civil Appeals, at Ft. Worth, in an opinion written by Mr. Justice Speer, and which was approved and commended by the Supreme Court of this state, said that the elevator company was "not the superior of McFadden in the sense that it had any control over the men or agencies employed in the work," but held that it could not cause to be dug in a public street an excavation, the necessary effect of which was to create an obstruction or defect which would render the street dangerous for travel unless properly guarded, without being liable for such injuries as are the direct result of such work; that in such case it is no defense that the work was in the hands of a competent independent contractor. The case of Kampmann v. Rothwell, supra, upon a similar state of facts, is to the same effect. The principle enunciated in these cases is the same invoked by appellees, and is well established by authority; but we think it inapplicable to the facts of the case under consideration. The practically uncontradicted testimony here, as we understand it, shows that the plant and substation of the Texas Traction Company were

constructed according to the most approved standard, and that while, perhaps, it was not impossible, it was impracticable to insulate wires of such voltage as that which killed the deceased George, and the public generally was in no way exposed to danger from them. Both the deceased, George, and T. E. Philpot were fully warned of the danger of coming in contact with the high-tension wires by J. T. Stark. Such warning was given George more than once, and on the day George was killed, and before he began making the framework connections, J. T. Stark pointed out and specifically warned him that the wire which caused his death was dangerous and would kill him if he touched it. The work that the deceased was called on to do, and was doing, had nothing to do with electricity or electrical connections, but was purely the work of a plumber and being done by the deceased as such on pipes not at all charged with electricity. It was clearly shown that the work the deceased was doing was not dangerous in itself, and could easily have been done without coming in contact with the wires charged with electricity. This, aside from the testimony of the witnesses to that effect, is evidenced by the undisputed fact that the connection of the framework was first made by the deceased without injury to him, but when completed it was discovered that one of the pipes did not run straight, which necessitated the loosening of one of the connections and again connecting it, and it was while this second connection, which was some four inches further removed from the high-tension wire than the first connection, was being made, that the deceased was killed. The arrangement of the substation, the wires, insulation, and operation of the plant at the time the deceased was killed was all in the usual and regular condition, and was being carried on in the usual and regular way, all of which must have been known to Stark and the deceased, George, at the time the work of connecting the framework was being done. Under this state of facts, we think it cannot reasonably be said that the Texas Traction Company knowingly set in operation, causes dangerous to the person of the deceased, without exercising the proper precaution to anticipate and prevent injury to him.

[3] The appellants Stark Grain Company contend, among other things urged for a reversal of the judgment of the district court: (1) That the proof shows that the Philpot Hardware Company, engaged by these appellants to erect and connect the framework necessary for their use to the iron pipes and framework of the Texas Traction Company, was an independent contractor; that Larkin George was an employé of said hardware company and appellants are in no way responsible for his death; (2) that the undisputed evidence shows that the death of the deceased George was the result of a risk assumed by him, and therefore verdict and judgment should have been for the grain company. We are inclined to think the first contention should not be sustained. The testimony shows not only that J. T. Stark was present at the time the work was being done by the deceased, supervising the same, but that before it was begun he advised and directed how it should be done. T. E. Philpot, representing the Philpot Hardware Company, testified: "I did not know how the work was to be done, except as I got it from Stark." This witness further testified that he went over to the substation with J. T. Stark to "plan some way to get this rail connected to the Traction Company's rail. Stark made out his plans exactly how he wanted his frame built, and then we discussed with him how we should make this connection." He states that they concluded they could make a connection that would answer the purpose and decided to make one. He further said: "When we left there George and I left together, and when we left our decision was to go and make our connection. I mean that was the decision of the three of us" (Stark, Philpot, and the deceased). This testimony, together with other testimony bearing upon the question, leads us to the conclusion that it cannot be said that T. E. Philpot was merely representing the will of the Stark Grain Company as to the result of the work he was engaged to do and not as to the means by which it should be accomplished. The mere fact that the proprietor retains a general supervision over the work for the purpose of satisfying himself that the contractor carries out the stipulations of his contract does not, it seems, make him responsible for wrongs done to a third person in the prosecution of the work. Thompson on Negligence, vol. 1, § 660. If, however, the proprietor retains for himself or for his agent a general control over the work, not only with reference to results, but also with reference to methods of procedure, then the contractor is not deemed an independent contractor within the rule under consideration. Thompson on Negligence, vol. 1, § 659; Kampmann v. Rothwell, supra; Drennon v. Patton-Worsham Drug Co., 109 S. W. 218; Lowell v. Railroad, 23 Pick. (Mass.) 24, 34 Am. Dec. 33.

[4] The second contention, which is also made by the appellant Texas Traction Company, is in our opinion well taken. The testimony so conclusively establishes that the deceased, Larkin George, knew of the dangerous character of the high-tension wires in the substation, including the one which caused his death, before and at the time he was making the framework connections, that reasonable minds cannot differ about it. Having knowledge, therefore, of the danger incident to the work he was doing, he as-

sumed the risk, and, regardless of the negligence complained of by the appellees, they are not entitled to recover damages on account of his death. The testimony shows that after the deceased had been notified and warned, a day or two before the work was begun, that the high-tension wires carrying 18,000 volts or more were very deadly, and that if he touched one of them it would kill him, he was asked, if he could do the work, and answered, "yes." The testimony further shows, without any contradiction or dispute, that on the day the deceased was killed, and before he began the work resulting in his death, the high-tension wires were pointed out to him by J. T. Stark and a specific warning given him that those wires, including the one with which he came in contact would kill him if he touched either one of them. J. T. Stark testified: "When we (George and myself) had made the measurements, we were talking all the time about the danger of the work, and I told George as explicitly as I could command language that those wires, pointing to each individual wire that was near each connection, were highly charged with electricity and would kill him if he touched them. That was the morning he did the work. * * * When Mr. George and I were taking the measurements and deciding where we would put the joints, I told Mr. George specifically of the danger of each of these wires, and told him where this joint was, and pointed out to him the wire that he got killed on, and I says that wire, there, pointing it out, carries 8,500 volts and will kill you if you touch it. * * * I told them (Philpot and George) that all of those wires were high-tension wires, except those that were low down." T. E. Philpot testified: "Mr. George was a competent workman for that work and was an efficient man. * * * He was a man of intelligence and of some reading and appeared to be a man of general information. * * * That it only required a few minutes to do the work that George was attempting to do at the time of the accident. That it was a simple thing and practicable to put it there and make that connection." He further said: That "it was the rule with plumbers to play all wires charged with electricity as dangerous and let the electrician's business alone. That they did not need any warning, that common sense teaches a man to go along about his own business and leave the other fellow's work alone." It further appears, without contradiction, that the wires pointed out to the deceased as high-tension and deadly wires were from 10 to 18 inches distant from the connections to be made in erecting the framework; that all the wires were open to observation; and that their arrangement, location, and condition must have been known to the deceased. He also knew that the high-tension wires were not insulated, and were highly charged with electricity; that the Texas Traction Company's plant was in operation and being operated in the usual and regular way at the time he attempted to do the work which resulted in his death; that he made no request that the wires be insulated or that the current of electricity be cut off before he began his work. There is some dispute as to the extent and character of warning given on the first occasion, and it is contended by appellees that on this occasion an inadequate and misleading warning as to which of the wires were insulated and harmless, and which were uninsulated and heavily charged with electricity, was given by J. T. Stark; but the testimony of Stark that on the day the work of connecting up the framework was begun, and a short time before the deceased was killed, he pointed out and specifically warned him that the wire which did cause his death was dangerous and would kill him if he touched it, is uncontradicted. T. E. Philpot testified that on the first occasion of Stark's warning as to the danger of the wires, which was a day or two before the work was begun, Stark said: "The high-tension wires are heavily charged, and will kill you. The lower wires are insulated and will not hurt you." But Stark's testimony, that on the day the work of installing the framework and making the connections was begun, and before the deceased, George, was killed, he gave the deceased a specific warning of the deadly character of the wire which killed him if he should come in contact with it, stands undisputed and, so far as we have been able to discover, is in no way materially discredited by anything appearing in the record.

In this state of the evidence it is quite clear, we think, that no ground of negligence upon which appellees predicate their right to recover was unknown to the deceased, George, at the time he undertook to do the work he was engaged in doing when killed, and that therefore he assumed the risk incident to such work. The evidence tending to show that an electrical current sometimes "jumps" and may kill without touching the wire was not of sufficient probative force to authorize and support a finding that the deceased was killed in that way, and therefore the failure to warn the deceased of that fact, if it is a fact, becomes immaterial. Besides, the evidence indicates very clearly that the deceased came in actual contact with the wire, and it was alleged in effect in appellees' petition. The deceased having assumed the risk incident to the work he was doing when killed, it must be held, no matter how deplorable the accident and how much it is to be regretted, that no cause of action exists in behalf of his widow and children for a recovery of damages on account of his death and their loss. This view renders a discussion of the other assignments of error unnecessary. The appel-

lants, under the practically undisputed evidence, were entitled to a peremptory charge directing a verdict in their favor, and, this being true, it becomes our duty to render such judgment in this court as should have been rendered in the court below. It is therefore ordered that the judgment of the district court be reversed and that judgment be here rendered in favor of all of the appellants. Reversed and rendered.