WILMA LYNN, by Her Next Friend, DANIEL H. LYNN, v. PINEHURST SILK MILLS, INC.

(Filed 20 March, 1935.)

1. **Trial D a—On motion to nonsuit all the evidence tending to support plaintiff's claim is to be considered in most favorable light to him.**

    Upon a motion as of nonsuit all the evidence upon the whole record tending to support plaintiff's cause of action is to be considered in the light most favorable to plaintiff, and he is entitled to every reasonable intendment thereon and every reasonable inference therefrom. C. S., 567.

2. **Electricity A a—Evidence held sufficient for jury on question of defendant's negligence in permitting excessive voltage to be carried to plaintiff's home over defendant's wires.**

    Evidence that defendant purchased electricity from a power company, that the electricity was delivered to it over wires carrying 550 volts, and that defendant then ran the current through transformers, reducing its voltage to 110, and sold it to occupants of its company houses, that the house in which plaintiff lived was so furnished with electricity, that the wires going to the house were not grounded to prevent excessive current,

that fuses and bulbs frequently burned out in the house, that the condition had been reported to defendant, and that plaintiff was injured when an overhead socket fell upon the bed in which she was sleeping, setting it afire, that there was no other fire in the house at the time, and that the ends of the wires after the accident were hot and smoldering, together with expert testimony that such condition was the result of excessive voltage or defect in the wires, *is held* sufficient to overrule defendant's motion as of nonsuit in plaintiff's action to recover for the personal injury sustained by her.

3. **Same—Instruction in this case as to duty of inspection and degree of care required of distributor of electricity held without error.**

The court's charge in this case that defendant distributor of electricity to household users was under duty to exercise a constant vigilance and observe a high degree of care in keeping its wires outside plaintiff's house in good repair and in keeping its transformers in a safe condition at all times, so that excessive and dangerous current should not be conducted into plaintiff's house, and that its failure to use such care would be negligence entitling plaintiff to recover if the proximate cause of her injuries, *is held* without error on defendant's exceptions.

4. **Evidence K a—**

The admission of testimony of an electrical expert, upon proper hypothetical questions, as to the electrical causes of burned-out fuses and light bulbs and a burned socket and as to the effect of grounding a wire, *is held* without error in this case.

Appeal by defendant from *Grady, J.,* and a jury, at March Term, 1934, of Moore. No error.

This is an action for actionable negligence, brought by Wilma Lynn, by her next friend, Daniel H. Lynn, against the defendant, alleging damage. The evidence on the part of plaintiff Wilma Lynn was to the effect: That she was the daughter of Daniel H. Lynn, who had been working for defendant as a weaver. That one Edgar R. Brown owned certain dwelling-houses that he leased to defendant. That Daniel H. Lynn rented one of the houses from defendant and paid for the house and lights. A receipt given him is as follows: "The Pinehurst Silk Mills, Inc. 260. D. H. Lynn, Time Ending 1-13-34. Total Wages $16.80. Rent and Light $1.05. Balance enclosed $15.75." There were other receipts of like import.

The Carolina Power and Light Company, in July, 1932, furnished defendant electrical power and energy. The voltage carried on the main line of the Carolina Power and Light Company is 11,000 to the substation at Hemp, back of defendant mills, at this place there is a transformer with a meter and the 11,000 volts are reduced to 550 volts, which are delivered through the meter to defendant, which then belongs to defendant. The defendant has a line that runs from the substation, furnishing power to the home of Daniel H. Lynn, and this line runs

from the mill to the houses on the mill hill and Lynn's home, serving them with power and lights. There was a transformer about 1,000 feet from the houses on the mill hill that reduces the voltage from 550 to 110 volts. Daniel H. Lynn had nothing to do with the upkeep or repair of the lights or the wiring system. The lights in his home burned out so many bulbs and the fuse plugs blew out and the lights went out so often he reported the condition to the superintendent of defendant mills several times. Daniel H. Lynn told Mr. West, superintendent of defendant mills, that he wanted him to come and see what was wrong, as he couldn't keep any fuse plugs or bulbs, and Mr. West said when he got time he would come over.

H. G. Lee testified, in part: "All these appliances and all of these wires and all of the equipment that furnished light to that mill village, including the Lynn house, belonged to and was under the control of the Pinehurst Silk Mills."

It is necessary to inspect the transformer frequently. The transformer was not inspected within seven months before Wilma Lynn was burned. High and excessive voltage will blow out bulbs and fuses.

Mrs. D. H. Lynn slept with her little boy and the plaintiff Wilma Lynn, who was about eleven years old. The light hung down over the foot of the bed and was left burning. No other light was burning in the house. The plaintiff Wilma Lynn screamed and waked her up between 1 and 2 o'clock in the morning. Mrs. Lynn testified, in part: "The fire was at the foot of the bed. I found part of the electrical equipment in the bed. When I first noticed the wires left on there, they were still hot and smoking. I saw the bulb that was in this socket after the child was burned. It didn't look like it did before the fire. It was a good deal larger than a usual bulb. It was what I call all swollen up and it was a dark color. I could not say it was black, but it was changed. . . . There was no other fire there about that house that night that could have caught that bed. It was on 28 July. The child's health before she was burned was in good condition, I consider. Her physical strength was good. Her ability to get about, walk, run, and play was extra good. It has been very poor since that time. Before she was hurt she was more interested in her school work than she is now. Well, as far as the child's suffering, I know she suffered untold misery, agony; I don't suppose anybody can express the suffering except yourself; I could see she was suffering miserably. Her condition, she was so nervous; it seemed like it scared her to death, she didn't want them touched. She was afraid and she screamed. Oh, she slept good before she was burned and, of course, she has been disturbed greatly in her sleep since she has been hurt. The action of her kidneys before was normal, of course, but since she has been hurt they are uncontrollable. . . .

One of the quilts burned up and I think the other one that I put out is at home. I didn't have any other covering on the bed that night besides those two quilts except a sheet."

F. L. Bunker, admitted to be an expert electrical engineer, testified, in part: "Q. What do you mean by 'grounding'? A. Attaching a wire permanently and solidly to the box and one wire to the circuit and connecting that rigidly to some solidly grounded object, or some object connected solidly in the ground. Q. What is grounding designed to do, what is the purpose of it? A. It is placed there to serve as a protection to life and property. Q. In what does it protect? A. To prevent the building up of a high voltage or the transmission of high voltage or transmitting higher voltage than is prepared for in the wiring of the house. Q. State whether or not this wiring system at the Lynn home is grounded in the manner that you have just referred to. A. It was not. Q. State whether or not there is any grounding there to prevent high voltage from entering that house. A. There was not. Q. Mr. Bunker, if the jury shall find from the evidence in this case, and by its greater weight, that for some time prior to the month of July, 1932, the fuses in the fuse box at that residence would blow out at frequent intervals, and that the bulbs—that is, the globes in the house—would burn out, what, in your opinion, could have produced the blowing out of those fuses and the burning out of the bulbs? A. An indication of defective wiring or equipment or high voltage or a combination of both. Q. If the jury shall find from the evidence in this case, and by its greater weight, that for some time prior to July, 1932, the fuses in the fuse box of that house blew out at frequent intervals and that the bulbs—light globes— in the house would burn out at frequent intervals, and shall find from the evidence in this case that while only one light was burning in that house that a portion of that light socket into which the bulb fitted and a portion of the wire fell loose, and shall further find that the remaining wires, that is, the wires attached to the house, the ends of those wires, were charred and burned and were smoking, what, in your opinion, could have caused the dropping of that socket and wire? A. That was an indication that there was either a defect in that wire leading to that socket or else high voltage jumped across in that socket, causing a short circuit, or it could have been both. Q. State whether or not when a drop cord is in proper condition and the usual or normal voltage enters such wire as you have just examined, whether or not with normal voltage and with a wire in proper condition it will break loose and fall. A. It would not. Q. State whether or not you have seen electric light bulbs, such as the one offered in evidence in this case, that have been subjected to heat that would increase in size and, if so, to what extent and what causes that condition, in your opinion. A. Yes, sir, I have, and

that could only happen if the bulb were heated abnormally and allowed to expand; some bulbs are vacuum and others nitrogen filled, and with a high pressure that would only happen in the nitrogen-filled bulb."

The issues submitted to the jury, and their answers thereto, were as follows: "(1) Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? A. 'Yes.' (2) What damage, if any, is the plaintiff entitled to recover of defendant by reason of said injury? A. '$5,000.'"

The court below rendered judgment on the verdict. The defendant made numerous exceptions and assignments of error, and appealed to the Supreme Court.

*H. F. Seawell, Jr., C. A. Douglass, and R. L. McMillan for plaintiff.*
*W. S. Coulter and U. L. Spence for defendant.*

CLARKSON, J. At the close of plaintiff's evidence and at the close of all the evidence the defendant made motions in the court below for judgment as in case of nonsuit. C. S., 567. The court below overruled these motions, and in this we can see no error.

On motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. An exception to a motion to dismiss in a civil action, taken after the close of the plaintiff's evidence and renewed by defendant after the introduction of his own evidence, does not confine the appeal to the plaintiff's evidence alone, and a judgment will be sustained under the second exception if there is any evidence on the whole record of the defendant's liability.

We think there is ample evidence to be submitted to the jury. In *Small v. Southern Public Utilities Co.,* 200 N. C., 719 (721), we find: "Following are some of the various expressions found in the decisions: 'Highest degree of care' (*Ellis v. Power Co.,* 193 N. C., 357, 137 S. E., 163); 'highest degree of care in maintenance and inspection' (*Benton v. Public Service Corp.,* 165 N. C., 354, 81 S. E., 448); 'high skill, the most consummate care and caution, and the utmost diligence and foresight . . . consistent with practical operation' (*Turner v. Power Co.,* 167 N. C., 630, 83 S. E., 744); 'greatest degree of care and constant vigilance' (*Mitchell v. Electric Co.,* 129 N. C., 166, 39 S. E., 801); 'very high degree of care' (*Harrington v. Wadesboro, supra* [153 N. C., 437]); 'all reasonable precaution' (*Turner v. Power Co.,* 154 N. C., 131); 'utmost care and prudence consistent with practical operation' (*Helms v. Power Co.,* 192 N. C., 784, 136 S. E., 9); 'rule of the prudent man' (*Hicks v. Tel. Co.,* 157 N. C., 519, 73 S. E., 139); 'highest skill

. . . which is attainable, consistent with practical operation' (*Electric Co. v. Lawrence*, 31 Col., 308) ; 'necessary care and prudence to prevent injury' (*Love v. Power Co., 86* W. Va., 397)."

In *Turner v. Power Co., 154* N. C., 131 (137), it is said: "It was earnestly urged for error that the judge below refused to nonsuit the plaintiff, and this chiefly on the ground that there was no direct evidence that electricity had been negligently transmitted into the building by defendants, and in excess of the voltage stipulated for in the contract. The court was also asked to charge the jury to the same effect, but the position, in our opinion, cannot be sustained. The presiding judge charged the jury that if the injuries resulted by reason of defective apparatus or appliances existent within the building, they would render their verdict for defendants, and in effect excluded from the consideration of the jury any and all imputation of wrong except that which might arise by reason of an excess of voltage transmitted into the building over the wires of defendants and by reason of negligent default on the part of the company or their agents. This being true, on the facts in evidence, the case permits and calls for an application of the doctrine of *res ipsa loquitur,* and requires that the question of defendant's responsibility should be determined by the jury. This doctrine has been discussed and applied in several recent cases before this Court, as in *Dail v. Taylor*, 151 N. C., 284; *Fitzgerald v. R. R., 141* N. C., 530; *Ross v. Cotton Mills,* 140 N. C., 115; *Stewart v. Carpet Co.,* 138 N. C., 66; *Womble v. Grocery Co.,* 135 N. C., 474." *McAllister v. Pryor,* 187 N. C., 832; *Lynch v. Telephone Co.,* 204 N. C., 252; *Collins v. Electric Co.,* 204 N. C., 320.

In the *Lynch case, supra,* at page 258-9, quoting from Jones, 2d Ed., Telegraph and Telephone Companies, part sec. 198, p. 225, *et seq.,* it is said: "Furthermore, where so dangerous an agency as electricity is undertaken to be delivered into houses by electrical companies for daily use, very great care and caution should be observed, and such a degree thereof as is commensurate with the danger involved, and which is enhanced by the lack of the consumer's knowledge of the safety of the means and appliances employed to effect the delivery. It is generally held that in case of injuries sustained from electric appliances on private property the doctrine of *res ipsa loquitur* applies, where it is shown that all the appliances for generating and delivering the electric current are under the control of the person or company furnishing the same."

The court below charged the jury, in part: "I furthermore charge you, gentlemen, that it was the duty of the defendant to keep its transformers and electrical wires outside of the Lynn home in good repair; it was its duty to keep a constant lookout, a constant vigilance, and to observe a high degree of care in keeping its equipment outside of the

house in good condition. It was the duty of the defendant to furnish to plaintiff's home electrical energy of such voltage as would not melt the wires inside the house and thereby set fire to the insulation which covered such wires. It was the duty of the defendant to see that its transformer was kept in a safe condition at all times, so as to reduce the current which flowed through it from a high voltage to a lower voltage—to such voltage as was within the resistance of the electrical equipment inside of the house where the plaintiff lived, and if it failed to do so in the exercise of that degree of care with which it is charged under the law, then it would be guilty of negligence, and if you so find, and further find by the same degree of proof that such negligence on its part was the proximate cause of the plaintiff's injuries, it would be your duty to answer the first issue 'Yes,' and if you fail to so find by the greater weight of the evidence, it would be your duty to answer it 'No.' "

The court below had theretofore fully and correctly charged the law of actionable negligence and proximate cause. We think this charge, on the facts of this case, favorable to defendant. We do not think the exceptions and assignments of error in regard to the charge comply with what is said in *Rawls v. Lupton,* 193 N. C., 428. Notwithstanding, we have examined the charge as a whole and see no prejudicial or reversible error—in fact, it is advantageous to the defendant.

We see no error in admitting the testimony of the electrical expert, Bunker. In its other exceptions and assignments of error to the evidence admitted as competent by the court below, the defendant says, in its brief: "This evidence, to which objections and exceptions were interposed, is, for the most part, inconsequential."

We see no error in the admission of the evidence complained of. On the record, we find

No error.