SHEILA LOCKLEAR BECK, ADMINISTRATRIX OF THE ESTATE OF DARYL IVAN BECK, DECEASED v. CAROLINA POWER & LIGHT COMPANY

No. 8110SC833

(Filed 1 June 1982)

1. **Electricity § 4; Negligence § 37.3— instructions on degree of care for power company**

    In a wrongful death action following the electrocution of a man by a utility wire, the trial judge was slightly incorrect in stating that "another rule" of negligence applies to power companies; however, the instructions had no prejudicial effect on the defendant as the instruction merely informed the jury that the degree of care owed by a power company in maintaining and inspecting its lines is a high degree of care, which degree of care is different from ordinary care required under ordinary circumstances.

2. **Electricity § 4; Negligence § 37.3— instructions—degree of care by utility company**

    In a wrongful death action against a power company, the trial judge did not commit prejudicial error by failing to couple the term "highest degree of care" with "consistent with the practical operation of its business" on every occasion on which the judge used the phrase "highest degree of care," since when the judge first set forth the duty of the power company, he clearly stated that the power company had a degree of care which was "commensurate with the practical operation of the business of an electric utility company."

3. **Trial § 34— instructions—equal stress to contentions of both parties**

    Where plaintiff presented the testimony of 19 witnesses and defendant presented the testimony of only three witnesses, by reviewing the evidence which the defendant presented and by stating that the defendant contended the plaintiff's allegations were untrue, the court adequately fulfilled its obligations to instruct the jury as to defendant's contentions.

4. **Death § 7.4— evidence concerning prospective economic losses of plaintiff properly admitted**

    The trial court in a wrongful death action properly permitted an expert in economics to testify on the prospective economic losses of the plaintiff from decedent's death where his testimony was based on testimony of work supervisors, testimony regarding the decedent's skills and wage data, and the expert's own expertise and ability to project a person's likely economic status. Such evidence provided a reasonable basis for the computation of damages even though the result was, at best, only approximate.

5. **Death § 7.4— wrongful death action—competency of hypothetical question**

    In a wrongful death action, the trial court properly permitted an expert to give his opinion in response to a hypothetical question referring to the statistical group of persons to which the decedent belonged.

6. **Electricity § 10; Death § 7.6— wrongful death action—punitive damages properly submitted to jury**

    In a wrongful death action in which decedent was electrocuted by a guy wire attached to defendant's power pole, plaintiff's evidence which tended to show numerous violations of the National Electrical Safety Code and of defendant's own standards was sufficient to merit the submission of the issue of punitive damages to the jury.

    Judge WHICHARD concurring.

    Judge MARTIN (Harry C.) dissenting.

APPEAL by defendant from *Godwin, Judge.* Judgment entered 17 February 1981 in Superior Court, WAKE County. Heard in the Court of Appeals 1 April 1982.

This action arose following the death of Daryl Beck, a 24-year-old Lumbee Indian. Beck was last seen alive at his mother's home in Robeson County on 1 July 1978. On 2 July 1978 his body was found in the woods behind his mother's home surrounding "Bill's pond." This area was frequently crossed by residents of this community who hunted in the woods and fished and swam in the pond. Daryl Beck was found lying halfway under a guy wire attached to Carolina Power & Light Company power pole 1998 in an area of low vegetation and within a few feet of a path which crossed through these woods.

When Beck's body was found, the skin on the palm of his right hand was burned and a skin-like substance was on the guy wire approximately 3-1/2 feet from the ground. An autopsy revealed burns on his right hand, left leg and the soles of both feet. Otherwise Beck appeared to be in good health at the time of his death. The cause of death was determined by a pathologist to be electrocution, consistent with electrocution caused by contact of the deceased's right hand with an energized wire.

In addition to the skin-like substance found on the guy wire on 2 July, leaves near the guy wire appeared burned. Leaves and grass at the base of the guy wire were scorched, forming a burned spot approximately 1-1/2' in diameter at the guy anchor. Fresh burn marks were on the guy wire, including burns on the wire 18" above and below the lightning arrestor.

Plaintiff's evidence tended to show that the condition of the equipment attached to pole 1998 was as follows:

(1) The transformer attached to pole 1998 was located in a congested corner of the pole. Due to this placement of the transformer, the lightning arrestor and arrestor cap, parts which are attached to the transformer, were only 1″ to 3-1/2″ from the guy wire at the time Daryl Beck's body was found. This close proximity of the lightning arrestor and arrestor cap, an energy-carrying part of the electrical system, to the guy wire, a non-energized part of the system, was in violation of both Carolina Power & Light Company's own specifications and the specifications of the National Electrical Safety Code, the mandatory and minimum safety rules of North Carolina with respect to electric utilities. The National Electrical Safety Code requires a minimum clearance of 7.8″ between an energized and non-energized part at 13,000 volts as was carried by this transformer.

(2) An examination of the lightning arrestor following Daryl Beck's death revealed that the lightning arrestor jumper, which connects the lightning arrestor to the arrestor cap, was separated from the lightning arrestor due to being broken or burned off in the presence of extreme heat. On the arrestor cap were signs of arcing and on the lightning arrestor were signs of melted black insulation. According to defendant's employee Bill Potter, who testified that the guy wire was 3-1/2″ from the lightning arrestor on his 2 July inspection of the facilities, this displacement of the arrestor cap from the lightning arrestor resulted in the cap being further from the guy wire at the time at which he observed it than it would have been before it had broken off from the lightning arrestor.

(3) An examination of the guy wire revealed that it was neither grounded nor insulated. This was in violation of both the National Electric Safety Code and Carolina Power & Light Company's own specifications. The National Electrical Safety Code requires that all guy wires be grounded if not insulated.

(4) Examination of the guy wire also revealed it to be slack; so slack that it could be pulled in either direction when grabbed and that when simply touched, it would sway. Bill Potter testified that he moved it 18″ in either direction. The slackness of the guy wire was in violation of the National Electrical Safety Code in that these safety rules require that guy wires be maintained with sufficient tautness so that they carry their load. This guy wire was not so maintained.

(5) During the several days following Daryl Beck's death periodic arcing was observed at the transformer on pole 1998.

Further evidence presented at trial revealed that the last documented occasion on which the pole in question was examined was in 1974. At that time, Sumpter Builders installed a new transformer on that pole, failing to place that transformer in the safest position on the pole. No inspection was performed by Carolina Power & Light Company of Sumpter Builders' work for the purpose of insuring that the work had been performed safely. Carolina Power & Light Company was unable to produce any record or witness indicating that this pole had been inspected for the purpose of insuring that it was in safe condition at any time between 1974 and July 1978.

Evidence through expert testimony showed that under the conditions found to exist on 2 July, the guy wire under which Daryl Beck's body had been found and on which a skin-like substance was found, could have become energized on being grasped. Physical evidence showed that this guy wire had been brought in contact with the lightning arrestor cap, an energized part of the electrical system. The voltage with which the guy wire would have been energized would have been of sufficient voltage to kill a person.

Evidence at the trial on the issue of damages consisted of testimony of Daryl Beck's family, friends and former employers. An expert economist also testified for plaintiff regarding the projected loss of income of the decedent. The jury awarded $200,000 compensatory damages to plaintiff and $175,000 punitive damages based on a finding that the defendant was grossly negligent.

*Thorp, Anderson & Slifkin by Anne R. Slifkin and William L. Thorp; Locklear, Brooks & Jacobs by Dexter Brooks, for plaintiff-appellee.*

*Fred D. Poisson and Manning, Fulton & Skinner by Howard E. Manning for defendant-appellant.*

MARTIN (Robert M.), Judge.

### THE JURY CHARGE ON THE ISSUE OF NEGLIGENCE

[1] Defendant's first argument on appeal is that the trial court failed to properly instruct the jury on the issue of negligence. The trial court instructed:

What is negligence? It's a lack of ordinary care. It's a failure to do what a reasonably careful and prudent person would have done, or the doing of something which a reasonably careful and prudent person would not have done; considering all of the circumstances existing at the time in question and on the occasion in question.

The court continued with another rule of negligence for electric utility companies:

There is another rule with respect to negligence that applies to electric utility companies. The rule of negligence that I have just read to you applies to individuals. It is a proper definition of negligence. An electric utility company owes to the public the highest degree of care, not ordinary care, but the highest degree of care for the safe installation, safe maintenance and safe inspection of the electrical lines and apparatus as is commensurate with the practical operation of the business of the electric utility company.

We agree with defendant that there is no separate rule of negligence for an electric utility company. The standard is always the rule of the prudent man or the care which a prudent man ought to use under like circumstances. "What reasonable care is, of course, varies in different cases and in the presence of different conditions. [Citation omitted.] The standard is due care, and due care means commensurate care under the circumstances." *Jenkins v. Electric Co.*, 254 N.C. 553, 560, 119 S.E. 2d 767, 772 (1961).

As a general rule, power companies are held to the "utmost diligence" in striving to prevent injury to others from electricity. *Keith v. Gas Co.*, 266 N.C. 119, 130, 146 S.E. 2d 7, 15 (1966). The courts view electricity as inherently dangerous and apply a correspondingly "higher standard of care." Wake Forest University, North Carolina Tort Practice Handbook 142 (1981).

In *Ellis v. Power Co.*, 193 N.C. 357, 137 S.E. 163 (1927), the decedent had been found dead near a path with an electrical wire in his hand. As in this case, the wire was uninsulated and the pole was found to be in an unsafe condition. No one had been seen inspecting or repairing the line. In discussing the duty of this defendant, the Supreme Court stated:

It [the wire] lay there, perhaps several days, like a serpent. The rattle-snake warns its victim, but not so with this subtle, invisible and death-producing power. It is a matter of common knowledge that this wonderful force is of untold benefit to our industrial life. . . . Every legitimate encouragement should be given to its manufacture and distribution for use by public utility corporations, manufacturing plants, homes and elsewhere. On the other hand, the highest degree of care should be required in the manufacture and distribution of this deadly energy and in the maintenance and inspection of the instrumentalities and appliances used in transmitting this invisible and subtle power.

*Id.* at 362, 137 S.E. 166.

In *Jenkins v. Electric Co., supra* at 560, 119 S.E. 2d 772, the court reasoned:

One who installs an instrumentality for a known use, which involves a great danger to life and limb, must exercise a degree of care commensurate with the danger for the protection of those who rightfully may be subject to the peril. The duty rests upon those who make and distribute the dangerous current . . . Electricity is not only dangerous, even deadly, but it is invisible, noiseless, and odorless, rendering it impossible to detect the presence of the peril until the fatal work is finished. It is for this reason that the high duty is imposed, a breach of it fixes liability for the resulting injury to those to whom the duty is owed. [Citation omitted.]

In *Lynn v. Silk Mills*, 208 N.C. 7, 11, 179 S.E. 11, 13 (1935), the Supreme Court acknowledged the " 'highest degree of care' " owed by the power company and refused to hold improper a judge's charge which stated that: "it was its [the defendant's] duty to keep a constant lookout, a constant vigilance, and to observe a high degree of care in keeping its equipment outside of the house in good condition." *Id.* at 12-13, 179 S.E. 14. Likewise, in *Letchworth v. Town of Ayden*, 44 N.C. App. 1, 4, 260 S.E. 2d 143, 145 (1979), *disc. rev. denied*, 299 N.C. 331, 265 S.E. 2d 396 (1980), this Court noted: " 'The danger is great, and care and watchfulness must be commensurate to it.' " (Citation omitted.) *See also Rice v. Lumberton*, 235 N.C. 227, 69 S.E. 2d 543 (1952); *Willis v.*

*Power Co.*, 42 N.C. App. 582, 257 S.E. 2d 471 (1979); and *Hale v. Power Co.*, 40 N.C. App. 202, 252 S.E. 2d 265, *disc. rev. denied*, 297 N.C. 452, 256 S.E. 2d 805 (1979), all stating that a supplier of electricity owes the "highest degree of care" in providing for the safety of the public.

Thus the courts agree that in order for a power company to be reasonably prudent in the exercise of its business, a high degree of care must be implemented because the hazards inherent in the business are great. This understanding of the duty of power companies does not differ in any significant or prejudicial fashion from that set out by Judge Godwin. Judge Godwin's instruction merely informed the jury that the degree of care owed by a power company in maintaining and inspecting its lines is a high degree of care, which degree of care is different from ordinary care required under ordinary circumstances. Although the judge may have been slightly incorrect in stating that "another rule" applies to power companies, the defendant has made no showing that this charge, when viewed as a whole, had any prejudicial effect on the defendant's opportunity to prevail on this issue.

[2] The defendant also protests that the court failed to couple the term "highest degree of care" with "consistent with the practical operation of its business" on every occasion on which the judge used the phrase "highest degree of care." When Judge Godwin first set forth the duty of the power company, he clearly stated that the company had ". . . the highest degree of care for the safe installation, safe maintenance and safe inspection of the electrical lines and apparatus *as is commensurate with the practical operation of the business of an electric utility company.*" (Emphasis added.) Later in discussing the degree of care the judge stated, "[t]his high degree of care . . ." The defendant has made no showing that within the context of the charge as a whole, this omission constituted prejudicial error. In fact, the charge as given could not be deemed prejudicial because the negligence which plaintiff alleged was the failure of the defendant to abide by its own rules and regulations and the rules and regulations promulgated by the National Electrical Safety Code and given the force of law by the Utilities Commission. See Rule R8-26, Rules and Regulations of the North Carolina Utilities Commission. Thus any failure of the judge to repeat the phrase "con-

sistent with the practical operation of its business" could have had no material impact on the outcome of this action.

[3]   The defendant's final argument concerning the jury charge is that the trial court did not give equal stress to the contentions of the defendant. This claim is without merit. Where one party presents substantially more evidence than the other, it is not error for the court's recapitulation of that party's evidence to be longer than the recapitulation of the evidence of the other party. *Love v. Pressley*, 34 N.C. App. 503, 239 S.E. 2d 574 (1977), *disc. rev. denied*, 294 N.C. 441, 241 S.E. 2d 843 (1978). Plaintiff presented the testimony of 19 witnesses who gave the jury information relating to the physical facts surrounding the decedent's death, medical findings, the scientific explanation for the decedent's death, the applicable standards of the industry, the worth of Daryl Beck to his family, friends and as a worker and the economic loss suffered by his family as a result of his death. Defendant's evidence consisted of three witnesses, none of whom gave testimony relevant to the plaintiff's decedent and none of whom could provide anything other than speculation as to the cause of Beck's death. By reviewing the evidence which the defendant presented and by stating that the defendant contended that plaintiff's allegations were untrue, the court adequately fulfilled its obligation to instruct the jury as to defendant's contentions.

The assignments of error based on the judge's charge are without merit and overruled. When an error in the judge's charge is asserted by the appellant as a basis for reversal of the verdict below, the burden is on that party not merely to demonstrate that the court's instructions were in error, but also to demonstrate that when the judge's instructions are considered in their entirety, as opposed to in fragments, the error was prejudicial to the appealing party's chance of success and amounted to the denial of a substantial right. Otherwise, reversal or a new trial is unwarranted. *Gregory v. Lynch*, 271 N.C. 198, 155 S.E. 2d 488 (1967); *Burgess v. Construction Co.*, 264 N.C. 82, 140 S.E. 2d 766 (1965). The defendant has failed to meet this burden.

### COMPENSATORY DAMAGES

[4]   The defendant next argues that the trial court erred by admitting into evidence the testimony of Dr. J. C. Poindexter, on

the prospective economic losses of the plaintiff. Dr. Poindexter, qualified as an economics expert, testified that based on the decedent's life expectancy, education, race, geographic location and sex he could project the loss of income support, reduced to present monetary value, incurred by Beck's wife Sheila and daughter Rekelle as a result of Daryl Beck's death. Dr. Poindexter testified that the figures produced through his calculations were consistent with the actual earnings received by Daryl Beck during his short work history. Dr. Poindexter pointed out that earnings of people within the statistical group which Dr. Poindexter utilized as representative of this decedent were low. In fact, in arriving at his opinion, Dr. Poindexter used computations which presumed an initial earnings figure less than that amount which Daryl Beck earned during 1978, the last year of his life. The economist testified that a loss figure of $186,245 was appropriate if Daryl Beck had worked until age 60, and that a figure of $204,037 was appropriate presuming a work life to 65. In addition, Dr. Poindexter valued the present value of Daryl Beck's projected in-home services for 10 hours per week at minimum wage, at $47,653.

The testimony of Dr. Poindexter was not improper speculation as defendant contends. The General Assembly intended the wrongful death statute to as fully as possible compensate persons for the loss of their decedent. *Bowen v. Rental Co.*, 283 N.C. 395, 196 S.E. 2d 789 (1973). In allowing recovery under this statute, the North Carolina courts have recognized that, by necessity, some speculation is necessary in determining damages. In *Bowen* at 419, 196 S.E. 2d 805-06, the court noted that monetary recovery cannot be denied simply "because no yardstick for ascertaining the amount thereof has been provided."

In *Brown v. Moore*, 286 N.C. 664, 673, 213 S.E. 2d 342, 348-49 (1975), in discussing the monetary value of a 17 year old, the court noted that although an award of damages must not be based on sheer speculation that:

> The present monetary value of the decedent to the persons entitled to receive the damages recovered will usually defy any precise mathematical computation. [Citation omitted.] Therefore, the assessment of damages must, to a large extent, be left to the good sense and fair judgment of the jury . . . The fact that the full extent of the damages must be a

matter of some speculation is no ground for refusing all damages. [Citations omitted.] . . . "The damages in any wrongful death action are to some extent uncertain and speculative. A jury may indulge in such speculation where it is necessary and there are sufficient facts to support speculation." [Citation omitted.]

Plaintiff has presented the testimony of an expert who has predicted economic loss based on available knowledge pertaining to Daryl Beck: testimony of work supervisors, testimony regarding the decedent's skills and wage data. This testimony also was based on Dr. Poindexter's own expertise and ability to project a person's likely economic status through the use of data available in his field. Such evidence provided a reasonable basis for the computation of damages, even though the result is, at best, only approximate. It is the function of cross examination to expose any weakness in such testimony. Normally, "the lack of sufficient basis for testimony goes primarily to the weight to be accorded such evidence." *Rutherford v. Air Conditioning Co.*, 38 N.C. App. 630, 639-40, 248 S.E. 2d 887, 894 (1978), *disc. rev. denied*, 296 N.C. 586, 254 S.E. 2d 34 (1979). Dr. Poindexter's testimony was properly admitted into evidence.

[5]   Furthermore, the trial court properly permitted Dr. Poindexter to give his opinion in response to a hypothetical question referring to the statistical group of persons to which Daryl Beck belonged. In examining Dr. Poindexter, plaintiff's counsel asked a hypothetical question which concluded as follows: " . . . do you have an opinion satisfactory to yourself as to the present monetary value or the reasonably expected net income for the statistical group of persons to which Daryl Beck belonged. . . ." In *Rutherford v. Air Conditioning Co.* at 638, 248 S.E. 2d 893, the expert witness was asked if he had an opinion "as to the present monetary value of the reasonably expected net income for the *statistical group of persons to which this deceased person belonged*. . . ." The defendant in *Rutherford* objected to this question on the ground that an expert opinion could not be based on facts, figures and statistics not in evidence. In rejecting the defendant's claim, this court noted:

> The facts, figures, statistics and charts relied upon by the witness, although not offered into evidence, are customarily

relied upon by persons in the profession. *See generally* Mc-Cormick, Evidence §§14-16 (2d Ed.). Based upon the better reasoned cases, such information may be relied upon by the expert regardless of whether admissible into evidence. . . .

. . . [Just as a] diagnosis . . . of injury is within the expertise of physicians and is based upon all reliable information which physicians consider when making such a diagnosis . . . an expert in economics commonly relies upon statistics and data relating to all aspects of the work force and economy which affect the present value of the loss of future income earning capacity.

Id. at 638-39, 248 S.E. 2d 893.

As in *Rutherford,* the materials on which Dr. Poindexter relied constituted information on which Dr. Poindexter appropriately based his expert opinion. The reports did not need to be introduced into evidence. The defendant had adequate opportunity to cross-examine the witness on these matters.

We have carefully considered defendant's remaining assignments of error regarding the compensatory damages and the testimony of Dr. Poindexter. We find these assignments to be totally without merit and thus overruled.

## PUNITIVE DAMAGES

[6] The defendant argues that the trial court erred in submitting the issue of punitive damages to the jury and that the court erred in its instruction on gross negligence as the basis for a punitive damages award. We disagree.

Our Court has stated that "[u]nder the common law of this State punitive damages may be awarded 'when the wrong is done willfully or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of plaintiff's rights.' " *Russell v. Taylor,* 37 N.C. App. 520, 525, 246 S.E. 2d 569, 573 (1978). " 'An act is wanton when it is done of wicked purpose or when done needlessly, manifesting a reckless indifference to the rights of others.' " *Siders v. Gibbs,* 39 N.C. App. 183, 187, 249 S.E. 2d 858, 861 (1978), citing *Foster v. Hyman,* 197 N.C. 189, 191, 148 S.E. 36, 37-38 (1929). An act is wilful when there exists "a deliberate purpose not to discharge some duty

necessary to the safety of the person or property of another," a duty assumed by contract or imposed by law. *Brewer v. Harris*, 279 N.C. 288, 297, 182 S.E. 2d 345, 350 (1971), citing *Foster v. Hyman, supra.*

Moreover, the North Carolina wrongful death statute specifically allows the award of punitive damages upon a showing of gross negligence. N.C. Gen. Stat. § 28A-18-2(b)(5) provides for punitive damages for wrongful death caused through "maliciousness, wilful or wanton injury, or gross negligence." Although the term gross negligence is not defined in the statute, based on prior case law the inclusion of gross negligence would authorize punitive damages in cases where the defendant's conduct was something less than wilful or wanton. Blanchard and Abrams, North Carolina's New Products Liability Act: A Critical Analysis, 16 Wake For. L.Rev. 171, 183-84 (1980).[1] In *Clott v. Greyhound Lines*, 9 N.C. App. 604, 609, 177 S.E. 2d 438, 441 (1970), *rev'd on other grounds*, 278 N.C. 378, 180 S.E. 2d 102 (1971), Judge Morris, now Chief Judge, stated that gross negligence was something less than willful or wanton conduct. We follow this position, a position in accord with the rule in other states that gross negligence is very great negligence or the absence of even slight care.[2]

---

1. *See, Clott v. Greyhound Lines, Inc.*, 278 N.C. 378, 180 S.E. 2d 102 (1971) (as a gratuitous bailee, a carrier is liable only for gross negligence); *Perry v. Seaboard Air Line Ry.*, 171 N.C. 158, 88 S.E. 156 (1916) (gratuitous bailee is liable only for gross negligence, which is a failure to exercise the care of an ordinary prudent person undertaking to carry the goods of another without compensation).

2. *See, e.g., Sumner v. Edmunds*, 130 Cal. App. 770, 21 P. 2d 159 (1933) (gross negligence is the absence of slight diligence and distinguishable from willful or wanton conduct); *Sebastian v. Wood*, 246 Iowa 94, 66 N.W. 2d 841 (1954) (a plaintiff may recover punitive damages upon a showing of gross negligence, something greater than ordinary negligence); *Storm v. Thompson*, 155 Or. 686, 64 P. 2d 1309 (1937) (gross negligence is the absence of care which even careless, thoughtless, or inattentive persons are accustomed to exercise). *See also Smith v. Stepp*, 257 N.C. 422, 125 S.E. 2d 903 (1962). In *Smith* the North Carolina Supreme Court applied Virginia case law to Virginia's automobile guest statute. The Virginia statute imposed liability for "gross negligence or willful and wanton disregard of the safety" of a passenger. *Id.* at 424, 125 S.E. 2d at 905. The Virginia courts had recognized gross negligence as something less than willful or wanton conduct. The North Carolina Supreme Court concluded that evidence of the defendant's lack of experience in driving a car, combined with her persistence despite plaintiff's protests, magnified the negligent character of the defendant's conduct, rendering the issue of gross negligence one for the jury. The North Carolina Court of Appeals later cited *Smith* as North Carolina authority for the rule that gross negligence is something less

Plaintiff's evidence which tended to show numerous violations of the National Electrical Safety Code and of defendant's own standards was sufficient to merit the submission of the issue of punitive damages to the jury.

The judge instructed the jury on gross negligence:

Gross negligence is an extreme departure from the ordinary standard of conduct; it is great or very great negligence; negligence materially greater than ordinary negligence, the difference being one of degree; although it is sometimes said to be of a different kind, negligence of an aggravated character and gross failure to exercise proper care.

The term implies a thoughtless disregard of consequences without exerting any effort to avoid them, an indifference to the rights and welfare of others. Gross negligence is a relative term, which is to be understood as meaning a greater want of care than is implied by the term ordinary negligence.

The plaintiff contends that she has shown by the greater weight of the evidence that the defendant, through its agents, erected pole 1998 and the attachments thereto in 1974, in violation of the safety code and in violation of its own specifications as has been set forth above; and that such conduct was negligence within itself; that the negligent condition continued continually until the day of the death of Daryl Beck; that if the defendant made appropriate inspections of the pole and attachments during the interim, it failed to note or to correct the alleged negligent condition; that Daryl Beck's death was proximately caused by such condition and that the complained of negligent conduct on the part of the defendant was willful or wanton or gross negligence.

And so, I instruct you that if you find by the greater weight of the evidence that the defendant's conduct in erecting, maintaining and inspecting pole 1998 and the attachments was accompanied by such aggravating cir-

than willful or wanton conduct in *Clott v. Greyhound Lines, Inc.*, 9 N.C. App. 604, 609, 177 S.E. 2d 438, 441 (1970), *rev'd on other grounds*, 278 N.C. 378, 180 S.E. 2d 102 (1971).

cumstances, under the instructions that I have given you—as under the instructions I have given you, will permit an award of punitive damages you may award to the plaintiff an amount which in your discretion will serve to punish the defendant and deter others from committing like offenses.

We agree with plaintiff that gross negligence is a lesser degree of wrongdoing than willful and wanton negligence. Therefore, the trial court's instructions were proper.

We have carefully examined all of defendant's assignments of error and found them to be without merit and overruled.

In the judgment of the trial court we find no error.

No error.

Judge WHICHARD concurs.

Judge MARTIN (Harry C.) dissents.

Judge WHICHARD concurring.

The first issue raised in the dissenting opinion, that relating to the instruction on independent contractors, was not argued in defendant's brief. Assuming there was in fact error in the instruction, it was not of such magnitude, in my view, that this Court should *ex mero motu* make it the basis for awarding a new trial.

As to the punitive damages issue, "[i]t is a well established principle of statutory construction that a statute must be construed, if possible, so as to give effect to every part of it, it being presumed that the Legislature did not intend any of its provisions to be surplusage." *State v. Williams*, 286 N.C. 422, 431, 212 S.E. 2d 113, 119 (1975). To treat the G.S. 28A-18-2(b)(5) phrases "willful or wanton injury" and "gross negligence" as synonymous, as does the dissenting opinion, effectively renders one or the other mere surplusage, contrary to the mandate of the foregoing rule of construction.

I believe the General Assembly intended, by use of the disjunctive in the phrase "through maliciousness, willful or wanton injury, *or* gross negligence," to establish three separate categories of wrongful conduct which could be found to have

caused a decedent's death. By analogy to the criminal law, conduct from which a jury could find murder could fall in the category of "maliciousness," *see, e.g., State v. Withers,* 271 N.C. 364, 156 S.E. 2d 733 (1967); conduct from which a jury could find voluntary manslaughter could fall in the category of "willful or wanton injury," *see, e.g., State v. Rummage,* 280 N.C. 51, 185 S.E. 2d 221 (1971); and conduct from which a jury could find involuntary manslaughter could fall in the category of "gross negligence," *see, e.g., Rummage, supra.*

For the foregoing reasons, I concur in the opinion by Judge Robert M. Martin.

Judge MARTIN (Harry C.) dissenting.

This cause of action arose 1 July 1978 and resulted in a lengthy and important trial in the Superior Court of Wake County. Nevertheless, I am compelled to dissent.

The defendant excepted to the following portion of the charge:

> And so I instruct you that you may find that Carolina Power & Light Company, that it may be found to be negligent under the doctrine of corporate negligence; and I instruct you that if you find from the evidence and by its greater weight that the defendant corporation has itself been negligent through its agents, *or independent contractors,* in failing to promulgate adequate safety rules, or failing to assure proper installation, maintenance and inspection of its electrical lines, poles and apparatus in accord with its duty to exercise the highest degree of care in performing such responsibility; and that such negligence was a proximate cause of Daryl Beck's death, then you may find that the defendant is liable to the plaintiff under the doctrine of corporate negligence. (Emphasis ours.)

I find this exception to be prejudicial error. Although the particular aspect of the challenged instruction discussed herein is not argued by counsel, I find the error so palpable as to require analysis by this Court. *See State v. Booher,* 305 N.C. 554 (1982). One of the principal acts of negligence alleged by plaintiff is that defendant did not take proper care in replacing the transformer

on the pole in 1974. At that time, a new transformer was installed to increase the voltage from 7,200 to 13,200 volts. All the evidence shows that Sumter Brothers, an independent contractor, made this change under a contract with defendant.

This portion of the charge allows the jury to find defendant liable for the acts of an independent contractor. Ordinarily, an independent contractor is not liable for injuries to third parties occurring after the work has been completed and accepted by the owner. *Price v. Cotton Co.*, 226 N.C. 758, 40 S.E. 2d 344 (1946); 26 Am. Jur. 2d Electricity § 54 (1966). It may be otherwise where the work done is so negligently defective as to be imminently dangerous to third persons, provided the contractor knows, or should know, of the dangerous situation created by him, and the owner does not know of the dangerous condition and would not discover it by reasonable inspection. *Price, supra; Williams v. Stores Co., Inc.*, 209 N.C. 591, 184 S.E. 496 (1936).

The facts in this aspect of the case are similar to *Texas Traction Co. v. George*, 149 S.W. 438 (1912). In *Traction Co.*, George was killed while installing a transformer at Traction's substation. George worked for a plumbing company that was doing the installation for the benefit of Traction and Stark Grain, Traction's customer. The court held that the plumbing company was an independent contractor and that Traction, the electric company, was not responsible for its negligence. The court further held that the installation of a transformer was not intrinsically and necessarily dangerous. Likewise, the actions of Sumter Brothers in installing the transformer for defendant were not ultrahazardous so as to invoke liability upon defendant. *Insurance Co. v. Blythe Brothers Co.*, 260 N.C. 69, 131 S.E. 2d 900 (1963) (blasting); *Evans v. Rockingham Homes, Inc.*, 220 N.C. 253, 17 S.E. 2d 125 (1941) (open ditch); *Cole v. Durham*, 176 N.C. 289, 97 S.E. 33 (1918) (opening in sidewalk).

Of course, where an electric company owes a direct duty to its patron, the duty cannot be evaded and shifted to an independent contractor. This principle is illustrated in *Alabama Power Co. v. Emens*, 228 Ala. 466, 153 So. 729 (1934). Alabama Power generated and distributed electricity. In addition, it sold and installed electrical home appliances. It engaged an independent con-

tractor to install a stove in plaintiff's home. A fire resulted from the negligent installation. The court held that where the power company sold and installed the electric appliance in the patron's home, it could not evade its responsibility to the patron by use of an independent contractor for the installation. The duty was a direct personal obligation from the power company to its patron. *See also National Fire Ins. Co. of Hartford v. Westgate Const. Co.*, 227 F. Supp. 835 (D. Del. 1964).

By installing the transformer through its independent contractor, Carolina Power & Light Company was not performing a direct personal duty to the deceased. Therefore, the general rule that there is no vicarious liability for the negligence of an independent contractor applies. *Hendricks v. Fay, Inc.*, 273 N.C. 59, 159 S.E. 2d 362 (1968).

The challenged instruction is also erroneous in that it would allow the jury to find defendant negligent by reason of Sumter Brothers' failing to promulgate adequate safety rules or failing to *assure* proper installation, maintenance and inspection of its electrical lines, poles and apparatus. There is no evidence that Sumter Brothers had a duty to promulgate adequate safety rules or to assure proper installation of the electrical facilities. These duties were obligations of the power company. The evidence of negligence as to Sumter Brothers was limited to its actions in the installing of the transformer in 1974.

I also find error in the punitive damage aspect of the case. Defendant excepted to the submission of issues 4A and B to the jury. The issues, and the answers by the jury were as follows:

4. Was Plaintiff's intestate Daryl Beck killed by:

A. The willful ~~and~~ or (APGJr) wanton negligence of Defendant Carolina Power and Light?

ANSWER: No

B. The gross negligence of Defendant Carolina Power and Light?

ANSWER: Yes

The trial court obviously believed that N.C.G.S. 28A-18-2(b)(5) (adopted 1973) (Cum. Supp. 1981) required that issues based upon

willful or wanton negligence and gross negligence be submitted to the jury. I find this to be error. The pertinent part of the statute reads: "(5) Such punitive damages as the decedent could have recovered had he survived, and punitive damages for wrongfully causing the death of the decedent through maliciousness, willful or wanton injury, or gross negligence."

As the majority states, gross negligence is not defined in the statute, although the statute has a section of definitions. By failing to define gross negligence for the purpose of the statute, the legislature obviously intended to adopt the meaning of gross negligence established by our Supreme Court. In addressing the question of gross negligence as a basis for punitive damages, the Court held:

> References to *gross* negligence as a basis for recovery of punitive damages may be found in our decisions . . . When an injury is caused by negligence, any attempt to differentiate variations from slight to gross is fraught with maximum difficulty. . . .

> An analysis of our decisions impels the conclusion that this Court, in references to gross negligence, has used that term in the sense of wanton conduct. Negligence, a failure to use due care, be it slight or extreme, connotes inadvertence. Wantonness, on the other hand, connotes intentional wrongdoing. Where malicious or wilful injury is not involved, wanton conduct must be alleged and shown to warrant the recovery of punitive damages. Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others. . . .

> True, decisions in other jurisdictions are somewhat divergent in the statement of the applicable rule. The divergence is greater in the application to specific factual situations.

*Hinson v. Dawson*, 244 N.C. 23, 27-28, 92 S.E. 2d 393, 396-97 (1956).

Thus, in 1956 our Court clearly established that with respect to punitive damages, gross negligence and wanton conduct are synonymous. This holding by our Court has been consistently followed in an unbroken procession of cases. *Newton v. Insurance Co.*, 291 N.C. 105, 229 S.E. 2d 297 (1976); *Brewer v. Harris*, 279

N.C. 288, 182 S.E. 2d 345 (1971); *Van Leuven v. Motor Lines*, 261
N.C. 539, 135 S.E. 2d 640 (1964); *Rubber Co. v. Distributors*,
253 N.C. 459, 117 S.E. 2d 479 (1960); *Jenkins v. Department of
Motor Vehicles*, 244 N.C. 560, 94 S.E. 2d 577 (1956); *Robinson v.
Duszynski*, 36 N.C. App. 103, 243 S.E. 2d 148 (1978); *Siders v.
Gibbs*, 31 N.C. App. 481, 229 S.E. 2d 811 (1976); *Brake v. Harper*, 8
N.C. App. 327, 174 S.E. 2d 74, *cert. denied*, 276 N.C. 727 (1970);
*McAdams v. Blue*, 3 N.C. App. 169, 164 S.E. 2d 490 (1968).

The principle is well stated by this Court, speaking through
Judge Robert M. Martin, in *Duszynski, supra*:

> Our courts have generally held that punitive damages
> are recoverable where the tortious conduct which causes the
> injury is accompanied by an element of aggravation, as when
> the wrong is done wilfully or under circumstances of
> rudeness or oppression, or in a manner evincing a wanton
> and reckless disregard of the plaintiff's rights. . . . In cases
> where plaintiff's action was grounded on negligence, our
> courts have referred to *gross* negligence as the basis for
> recovery of punitive damages, using that term in the sense of
> wanton conduct. *Hinson v. Dawson*, 244 N.C. 23, 92 S.E. 2d
> 393 (1956). In *Hinson*, the Court explained that "[c]onduct is
> wanton when in conscious and intentional disregard of and in-
> difference to the rights and safety of others."

36 N.C. App. at 106, 243 S.E. 2d at 150. It is to be noted that
*Duszynski* was a wrongful death case in which the issue of
punitive damages was controlled by N.C.G.S. 28A-18-2(b)(5), as in
the case sub judice.

The majority relies upon *Clott v. Greyhound Lines*, 9 N.C.
App. 604, 177 S.E. 2d 438 (1970), *rev'd*, 278 N.C. 378, 180 S.E. 2d
102 (1971), a bailment case, in which the Court of Appeals stated:
"Our Supreme Court has defined gross negligence as 'something
less than willful and wanton conduct.' *Smith v. Stepp*, 257 N.C.
422, 125 S.E. 2d 903 (1962)." 9 N.C. App. at 609, 177 S.E. 2d at 441.
While it is true that *Smith v. Stepp* does contain the quoted
language, it must be understood that our Supreme Court was
stating the law of the Commonwealth of Virginia, not the law of
North Carolina. *Smith* involved an automobile accident that oc-
curred in Virginia, but the lawsuit was tried in North Carolina.
The Court was concerned with the application of Virginia's guest

passenger statute which required a finding of gross negligence to support recovery. The Court cited as authority for the quoted statement the Virginia case of *Thomas v. Snow*, 162 Va. 654, 174 S.E. 837 (1934). Furthermore, the *Clott* opinion by this Court was reversed by the Supreme Court. Although *Duszynski* did not cite or refer to *Clott*, it was decided subsequent to *Clott* and, by implication, removes any vestigial authority of *Clott* in this regard. The *Clott* decision cannot be taken as authority that the quoted statement is the law of North Carolina. Rather, *Hinson v. Dawson, supra,* remains the law of North Carolina.

This position with respect to punitive damages is also consistent with the philosophy expressed in *Hinson* that "[W]e are not disposed to expand the doctrine beyond the limits established by authoritative decisions of this Court." 244 N.C. at 27, 92 S.E. 2d at 396.

Although it can be argued that under the law of *Hinson* the jury, by finding in its answer to issue 4A no willful or wanton conduct on the part of defendant, has foreclosed the issue of punitive damages, it is submitted that a more just result is to allow a new trial on that issue. The submission of issues 4A and B resulted in a misapplication of the law with respect to punitive damages. Only one issue should be submitted to the jury with respect to a basis for allowing punitive damages.

I vote for a new trial on all issues consistent with this opinion.