*********** EVIDENTIARY RULINGS
Defendants submitted new evidence in the form of two affidavits at the hearing before the Full Commission. Plaintiff objected. The Full Commission finds the affidavits of Gary Purvis and Nancy Wall were timely submitted and shall be admitted in to evidence in this matter.
Plaintiff filed a motion to introduce newly discovered evidence in the form of a memo on defendant-employers letterhead dated December 19, 1996. The Full Commission will accept the December 19, 1996 memo submitted by plaintiff into evidence.
 ***********
The undersigned finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Hartford Accident Indemnity is the carrier on the risk.
4. Plaintiff sustained a compensable injury by accident to her hand on May 17, 1993.
5. Plaintiff was paid temporary total disability from May 17, 1993 and until April 10, 1994, when she returned to work. She was paid no compensation from November 22, 1996, when she was laid off, through the present time.
6. Plaintiff's compensation rate as set forth on the Form 21 is $216.54 as calculated from her average weekly wage of $324.80.
7. On June 23, 1993, the parties entered into a Form 21 agreement whereby plaintiff was to be paid for "necessary" weeks subject to wage verification.
8. The parties stipulate to Form 25R signed by Dr. Robert Kahn that the Plaintiff has 75% disability to each of the index finger, second finger, third finger, and fourth finger of her left hand.
9. The parties have stipulated a bound and indexed set of medical records.
10. The issues to be resolved are as follows:
 a. Is plaintiff entitled to temporary total benefits for the period of temporary disability between date of "lay-off" on November 22, 1996 until the present date, with credit for unemployment compensation?
b. Is plaintiff entitled to prosthesis fingers?
 c. Is plaintiff entitled to receive compensation based on the difference between the wages she earned at the time of the injury compared to the wages earned thereafter?
 d. Is plaintiff entitled to an election of remedies based upon her permanent and total disability rating?
 e. Is plaintiff entitled to a 10% penalty payment for unsafe conditions consisting of OSHA violations pursuant to G.S. § 97-12?
 f. Is plaintiff entitled to attorney fees and costs from defendants because defendants' defense was not based upon reasonable grounds? N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon all of the competent evidence of record and reasonable inferences drawn there from, the undersigned makes the following additional:
 FINDINGS OF FACT
1. Plaintiff is 53 years old (DOB: 2/17/48) and is a high school graduate. Plaintiff is divorced with six children and lives in Ahoskie. The two youngest children reside with plaintiff.
2. Plaintiff had worked for the defendant-employer, Easco Aluminum Corp., for a period of 20 years prior to May 17, 1993. She operated a Press Brake, which is a mechanical press for bending aluminum pieces or cutting aluminum pieces.
3. Plaintiff worked as a machine operator on Press Brake machines at Easco on an average of two or three times a week for twenty years, except for a two-year stint in the anodizing department. Plaintiff admitted to receiving approximately ten minutes of training on how to safely operate the Press Brake.
4. Plaintiff's job did not have production requirements, but did have production guidelines. Plaintiff was never reprimanded for not meeting production, and her supervisor, Melvin Gurganus, had never written anybody up for not meeting a production rate.
5. On May 17, 1993, plaintiff was uncertain as to exactly what happened that caused her fingers to be crushed in the Press Brake Machine. She was uncertain as to whether she had actually operated the foot pedal or not.
6. On May 17, 1993, plaintiff was operating Press Brake Machine No. 4, but she was not feeling well. She was hot, feeling sick, and suffering from dizzy spells or light-headedness. This was a condition she often experienced, yet she would not tell anybody when she was suffering from this condition. She related the condition to her high blood pressure, or some type of inner ear problem or "balance disease." Because she was hot that morning, she wanted to find somebody to bring her a fan, and as she turned around, the last thing she remembers is holding onto the machine to hold herself up. She was not holding any aluminum part at the time of her accident, and plaintiff admitted that the thirty inch piece with which she was working makes it impossible to get your hand into the machine while fabricating it. Plaintiff does not recall how her fingers got into the machine, nor how the machine activated, but it did, severely injuring four fingers on her left hand. This was stipulated to be compensable under the Workers' Compensation Act.
7. As a result of her injury, plaintiff underwent several operations and was left with four partially amputated fingers on her left hand. She received temporary total disability benefits at a weekly compensation rate of $216.54 beginning on her date of injury until she returned to work on April 11, 1994. On December 20, 1993, although not at maximum medical improvement, plaintiff received a 75% permanent partial disability rating to each of her four fingers on her left hand from her treating physician, Dr. Kahn. On February 7, 1994, she was released from Dr. Kahn's care.
8. Plaintiff was initially given prosthetic fingers for cosmetic reasons, but the cosmetic fingers did not match her normal skin tone and she mailed them back to the physician in Elizabeth City who had provided them. Later, she learned that the prosthetic fingers had been lost in the mail. Plaintiff initially did not want prosthetic fingers, but, at the time of the hearing, plaintiff did desire prosthetic fingers for cosmetic reasons.
9. Plaintiff returned to work with defendant on April 11, 1994, in Quality Control as an Inspector. She worked with two other people, mainly measuring and checking quality of metal pieces within the plant. Plaintiff performed this job satisfactorily for two and a half years with the assistance of others. Due to the amputation of her fingers on the left hand, plaintiff could not do heavy lifting and required assistance to accomplish the essential functions of that job. Many normal tasks became more difficult for plaintiff to accomplish as a result of the amputation of her fingers. Such tasks as sweeping and driving were difficult. Plaintiff also suffered from disruption in sleep pattern.
10. Due to market conditions, Easco has a lay-off approximately every two years. The employer's contract with its union demands that individual layoffs be controlled by department seniority. Plaintiff, with a relatively "new" job in Quality Control, was laid off effective November 24, 1996, and received unemployment benefits for 13 weeks at $320.00 per week.
11. Annette Ruth, a certified rehab counselor with American Rehabilitation, found positions similar to the inspector position in various industries in Hertford County. In addition to being called quality inspectors, they were also called graders, testers, and assurance inspectors. The evidence shows that the inspector position had existed for many years at defendant-employer's plant; however, it is a "make-work" position with respect to plaintiff, in that the job was modified and assistance by other employees was provided to plaintiff in order for her to perform the required job duties. As to other similar jobs in Hertford County, no evidence was submitted to show that plaintiff would be hired in any of these positions in a competitive job market given her disability from the compensable injury.
12. Plaintiff had had carpal tunnel in her right hand since 1991, and she received prior disability ratings to her right hand fingers in 1985. She also had high blood pressure, an inner ear problem, and a blood clot in her leg. She gets headaches, becomes dizzy and has occasional numbness in her arm and eyes.
13. Ms. Linda Ealey was also an employee of defendant-employer who worked on the same Press Brake machine upon which plaintiff had been injured. She had been employed about two years and three months by defendant-employer at the time of plaintiff's injury. Ms. Ealey was working at the plant on May 17, 1993.
14. According to Ms. Ealey, the Press Brake machine occasionally operated by itself, sometimes when the foot pedal was not activated. She was aware of three different occasions when a brake press machine had operated on its own without the foot pedal being pushed to activate it. Ms. Ealey had reported the machine as malfunctioning.
15. If guards had been in place on the Press Brake machine upon which plaintiff operated, according to Ms. Ealey, it would have been impossible for finger injuries or amputations to occur. Following plaintiff's injury, guards were placed on the Press Brake machine.
16. Defendant-employer's Press Brake machines did not have guarding as defined by North Carolina's OSHA Manual. Moreover, the press brake machines did not prevent entry of hands and fingers into the point of operation. Defendant-employer willfully failed to come in to compliance with OSHA standards, even though they had been informed by at least one employee of problems with the Press Brake machine.
17. According to Mr. Melvin Gurganus, also an employee of defendant-employer, many portions of the OSHA Manual were not being enforced or in place at the time of plaintiff's injury. Mr. Gurganus confirmed that a guard was put on the machine after plaintiff was injured. Defendant-employer no longer owns press brake machines of the sort upon which plaintiff was injured.
18. Mr. Gurganus assisted plaintiff with her job as a quality control inspector. According to Mr. Gurganus, plaintiff could only perform some of the tasks in the plant subsequent to the amputation of her fingers, not all listed job tasks.
19. According to Mr. Gurganus, the jobs described by defendant-employer on video for plaintiff's doctor to review as possible jobs for plaintiff after her return to work, were all production jobs. In addition, all the "possible" jobs involved the use of both hands.
20. Mr. Gurganus was unaware that plaintiff would need assistance lifting parts when he was hired as a Quality Control Inspector. The other two Quality Control Inspectors have the full use of both hands. In fact, no Quality Inspectors, without full use of both hands, were ever employed by defendant-employer. Because of her amputation of fingers, plaintiff required special assistance on occasions to perform her tasks as inspector.
21. Ms. Annette Ruth, a vocational rehabilitation consultant attempted to assist plaintiff find a job. Ms. Ruth developed a vocational plan for plaintiff, but there is no evidence of Ms. Ruth ever locating suitable employment for plaintiff.
22. Plaintiff treated with Dr. Joan Rose, an orthopaedic surgeon in Norfolk, Virginia as a result of a recommendation by defendants. Dr. Rose viewed eight potential jobs for plaintiff which had been videotaped. However, she only approved the Saw Helper position. Dr. Rose did not consider the inspector position, as that job was not available at the time.
23. According to Dr. Rose, the amputation of plaintiff's fingers created hand restrictions. Those restrictions affected and limited her ability to perform repetitive movement and production work. It would also affect her ability to grasp and manipulate objects with her injured left hand.
24. Dr. Sheldon Downes is an expert in the field of vocational rehabilitation. Dr. Downes personally met with plaintiff and examined her limitations as well as administering vocational tests. Dr. Downes' report was admitted into evidence and is attached to his deposition. According to Dr. Downes, "Rachel Jenkins has a very significant disability. Her work has always involved the use of her hands. Jobs which require any finger dexterity or rapid movements will be impossible for her to accomplish. In addition to the functional limitations, she also has a very visible cosmetic defect to her left hand. This by itself would deter most employers from hiring her." Dr. Downes did concede that the cosmetic defect may not have as much negative impact with employers if seeking jobs that are located within a plant and require little or no contact with the public.
25. Prosthetic fingers will not enable plaintiff to perform any work, but will be aesthetically pleasing. Dr. Downes viewed the videotape defendants prepared demonstrating ten or so positions at defendant-employer's which might be available for plaintiff. Dr. Downes did not believe plaintiff could perform any jobs except the Saw Helper position. Dr. Downes was not familiar with the Saw Helper position other than the limited video footage he observed.
26. Plaintiff's inspector job in Quality Control, which she worked between April 11, 1994 and November 22, 1996 was not a competitive job existing in the job market, but rather was created especially for plaintiff, since tasks were modified and plaintiff required assistance in completing tasks.
27. Billy Saulter was a paid expert, who testified on behalf of plaintiff. Mr. Saulter owns a company called Safety Plus. He met with plaintiff only once, and he never observed the machines inside Easco. According to Mr. Saulter, there is an exception within OSHA requirements pertaining to Press Brakes. When asked whether he knew if the type of Press Brake utilized by plaintiff fell within this exception, he indicated he was not absolutely sure.
28. Mr. Saulter viewed the videotape containing employees performing the ten jobs chosen as suitable for plaintiff by defendant-employer. Mr. Saulter had safety concerns about all of the jobs.
29. Defendant-employer had knowledge through its employees such as Ms. Ealey that some Press Brake machines were inadequately guarded. Failure to bring the brake press machines back into compliance was an OSHA violation of which defendant-employer had knowledge of and willfully failed to come into compliance. C.F.R. § 1910.212 requires that guards should be applied where possible. It is the responsibility of management at defendant-employer's to maintain guards in a serviceable condition. The required standards were not met. Defendant-employer did install guards immediately after plaintiff's accident indicating that itwas possible to install guards on the press brake machines, and therefore, should have been done. It was also the responsibility of the defendant-employer's supervisor to properly train plaintiff in using the machine with guards. Such training did not occur in violation of OSHA standards. See OSHA Publication 3067 (1992).
30. Defendant-employer submitted forms to Dr. Joan Rose, an orthopaedic surgeon in Virginia, to give plaintiff a rating subsequent to the hearing. Rather than give a rating, Dr. Rose set forth plaintiff's left hand restrictions in grasping, pushing and pulling, fine manipulation and also limitations in reaching. Plaintiff was also advised to avoid exposure to cold.
31. Based on a follow-up letter of July 17, 1997, Dr. Rose described plaintiff's injuries as "severe trauma of the left upper extremity with amputations of portions of the left index, middle, ring and small fingers." According to Dr. Rose, plaintiff was unable to perform any of the jobs on the videotape except for the Saw Helper position.
32. Plaintiff is not employable at this time due to her physical disabilities to both hands and her lack of vocational skills, age and education, and will require retraining and assistance with job searches in order to return to competitive employment. Plaintiff has a diminished wage earning capacity, which was stipulated to by counsel for defendant-employer in Dr. Downes' deposition as follows, "And I think it's obvious and we'll stipulate that she was making $9-something an hour because of her tenure there. She worked there for 20 years. So, I'll stipulate to the fact that if she were starting somewhere in a new company, it would be much lower."
33. Plaintiff's average weekly wage at all relevant times was $324.80, yielding a compensation rate of $216.54 per week.
 ***********
The foregoing stipulations, findings of fact, and conclusions of law engender the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to her hand on May 17, 1993. N.C. Gen. Stat. § 97-2.
2. As a result of her compensable injury, plaintiff was disabled and was unable to earn wages of any kind from May 17, 1993 to April 10, 1994. She was paid temporary total disability during this period. Plaintiff returned to work as a Quality Control Inspector on April 10, 1994. Plaintiff's position was modified and can be characterized as "make-work." Since plaintiff's job was make-work, defendants have not established that plaintiff was capable of obtaining a position suitable to her age, education, experience, and with her physical limitations due to her disability. Bridges v. Linn-Corriher Corp., 90 N.C. App. 397,368 S.E.2d 388, disc. rev. den.; 323 N.C. 171, 373 S.E.2d 104 (1988);Peoples v. Cone Mills Corp., 316 N.C. App. 426, 342 S.E.2d 798 (1986).
3. Plaintiff was laid off from her "make work" position on November 22, 1996 and no other work has been made available. Defendants produced no evidence that there are other jobs available in the job market which plaintiff could obtain given her restrictions. Plaintiff has presented evidence that she is totally disabled at this time and will require extensive retraining and assistance with job searches and job placement to return to gainful employment. Radica v. Carolina Mills,113 N.C. App. 440, 439 S.E.2d 185 (1994).
4. Plaintiff is entitled to temporary total disability benefits at her compensation rate of $216.54 per week for the period of temporary disability between date of her "lay-off" on the November 22, 1996 until the date of the filing of this Opinion and Award (with credit for the Unemployment compensation arranged by the employer) pursuant to N.C. Gen. Stat. § 97-29 and henceforth until plaintiff returns to work or until further Order of the Commission.
5. Plaintiff is entitled to have defendants provide her with prosthetic fingers pursuant to N.C. Gen. Stat. § 97-25. McDonald v.Brunswick Electric, 77 N.C. App. 753, 336 S.E.2d 407 (1985).
6. Plaintiff is entitled to a 10% penalty for unsafe conditions created by defendant-employer pursuant to N.C. Gen. Stat. § 97-12
because of OSHA violations (29 C.F.R. § 1910.212) for which defendant-employer had prior knowledge and willfully chose not to comply with the OSHA regulations. Plaintiff has met her burden of proof with regard to defendants' actions being willful. "An act is willful when there exists `a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another,' a duty assumed by contract or imposed by law." Beck v. Carolina Power Light Co.,57 N.C. App. 373, 291 S.E.2d 897 (1982), citing Brewer v. Harris,279 N.C. 288, 182 S.E.2d 345 (1971).
7. Plaintiff's counsel is not entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1, as defendants had a reasonable basis for contesting plaintiff's claim.
8. Plaintiff has a 75% disability to each of her injured fingers. The Industrial Commission assumes the plaintiff would elect the remedy provided by N.C. Gen. Stat. § 97-31 as her more munificent remedy. However, if plaintiff has been paid for her permanent partial disability rating, defendants are entitled to a credit in such amount against any N.C. Gen. Stat. § 97-29 Award.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary total disability payments from November 22, 1996 until further Order of the Commission at the rate of $216.54 per week, subject to credit for any N.C. Gen. Stat. § 97-31 benefits which have been previously paid by defendants. Defendants are entitled to a credit for unemployment compensation arranged by defendant-employer. The temporary total disability from November 22, 1996 until the filing of this Opinion and Award has accrued and shall be paid in a lump sum subject to attorney's fees.
2. Defendants shall provide plaintiff prosthetic fingers, should she desire them, within a period of 60 days from the filing of this Opinion and Award.
3. Defendants shall pay a 10% penalty on temporary total disability benefits due and owing from November 22, 1996 until the present date, which amount has accrued, for the violation of OSHA Regulation 212 Standard pursuant to N.C. Gen. Stat. § 97-12.
4. Plaintiff's counsel shall be paid 25% of the amounts awarded in paragraphs 1 and 3 herein which has accrued and is to be paid in a lump sum to be subtracted from the amount due plaintiff and sent directly to plaintiff's counsel. Henceforth, plaintiff's counsel shall be sent every fourth check.
5. Defendants shall bear the costs.
This 19th day of February 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________ RENE C. RIGGSBEE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER