***********
The Full Commission has reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Donovan, and the briefs and oral argument before the Full Commission. The appealing party has shown good ground to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On June 4, 2001, the parties were subject to the North Carolina Workers' Compensation Act.
2. On June 4, 2001, an employer-employee relationship existed between the parties.
3. On June 4, 2001, plaintiff suffered an injury by accident arising out of and in the course of his employment with defendant-employer, when he fell through a skylight on the roof of defendant-employer's premises.
4. On June 21, 2001, defendants filed a Form 60, Employer's Admission of Employee's Right to Compensation.
5. Plaintiff's average weekly wage is $450.00, yielding a compensation rate of $300.00 per week.
6. Defendants have paid plaintiff temporary total disability compensation in the amount of $300.00 per week since June 4, 2001 and continuing.
7. Defendants have paid for plaintiff's medical expenses incurred for treatment of injuries suffered on June 4, 2001, including medical care provided by Person Memorial Hospital, Duke University Medical Center, Durham Rehabilitation Institute, UNC Hospitals, Dr. Kristine Herfkens, Dr. William Mallon of Triangle Orthopaedic Associates, Dr. Dennis Turner of the Neurosurgery Clinic at Duke Hospital, Dr. Jennifer Green, Endocrinologist at Duke Hospital, Dr. Mitchell Freedman, Dr. Tadeusz Poplawski, Dr. Timothy Stroupe, Dr. Peter Adland and Dr. James Whelan.
8. Defendants have paid for attendant care services for plaintiff for 11 hours per day, Monday through Friday, from June 30, 2001 to April 2, 2004 and seven hours per day, Monday through Friday, from April 2, 2004 to the present and continuing.
9. The parties stipulated the following documentary evidence into evidence before the Deputy Commissioner:
 a. Stipulated Exhibit #1: Medical records
 b. Plaintiff's Exhibit #1: OSHA report and agreement
 c. Plaintiff's Exhibit #2: OSHA citations
 d. Defendants' Exhibit #1: Medical records regarding attendant care
 e. Attached to the deposition of Dr. Wells are the following:
 i. Plaintiff's Deposition Exhibit #1: OSHA inspection report
 ii. Plaintiff's Deposition Exhibit #2: OSHA citations
 iii. Plaintiff's Deposition Exhibit #3: OSHA report and agreement
 f. Attached to the deposition of Dr. Adland is the following:
 i. Plaintiff's Deposition Exhibit #1: Medical records
 g. Attached to the deposition of Dr. Stroupe are the following:
 i. Plaintiff's Deposition Exhibit #1: Medical records
 ii. Plaintiff's Deposition Exhibit #2: Correspondence
 h. Attached to the deposition of Dr. Gualtieri is Defendants' Deposition Exhibit #1: Curriculum Vitae
 i. Attached to the deposition of Dr. Herfkens are the following:
 i. Defendants' Deposition Exhibit #1: Curriculum Vitae
 ii. Defendants' Deposition Exhibits #2, 3 and 4: Medical records
10. The issues before the Full Commission are whether plaintiff, as a result of the June 4, 2001 injury by accident, is entitled to receive 24-hour attendant care provided by his wife or another unskilled caregiver, dating from June 30, 2001 and continuing; and whether plaintiff's June 4, 2001 injury by accident was caused by the willful failure of defendant-employer to comply with any statutory requirements.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. On June 4, 2001, plaintiff was employed as the manager of the detail department for defendant-employer, an automobile dealership. Plaintiff was working on the roof of the premises cleaning gutters, when he fell through a skylight. As a result of the fall, plaintiff suffered various injuries, including a fractured skull and a traumatic brain injury.
2. Plaintiff was hospitalized at Person County Memorial Hospital and Duke University Medical Center. Thereafter, plaintiff was treated at Durham Rehabilitation Institute and was released on June 30, 2001.
3. Following his discharge, plaintiff exhibited several physical and behavioral deficits as a result of the brain injury suffered in the June 4, 2001 workplace injury by accident. Plaintiff has permanent injuries including poor balance, restricted visual field, hearing loss and delayed reaction time. Plaintiff also has Type I diabetes, which pre-existed the work injury; however, the permanent injuries have affected his ability to adequately control the condition and have caused plaintiff to suffer seizures. In 2003, plaintiff was provided with an implanted insulin pump to control the diabetes.
4. Defendants have provided and paid for medical care, which has been reasonably necessary for the treatment of plaintiff's injuries resulting from the June 4, 2001 injury by accident. In addition, defendants have provided attendant care services for plaintiff for 11 hours per day, Monday through Friday, from June 30, 2001 through April 2, 2004, and for seven hours per day, Monday through Friday, from April 2, 2004 through the time of the Deputy Commissioner's hearing and continuing. During those periods where professional attendant care has not been provided, plaintiff's wife, Kim Roberson, has provided plaintiff's care.
5. Dr. S. Timothy Stroupe provided psychiatric services to plaintiff for treatment of major depression, from August 23, 2001 until July 5, 2004, when he relocated out of state. Since that time, plaintiff's psychiatric treatment has been provided by Dr. Peter F. Adland.
6. At his deposition, Dr. Stroupe opined that plaintiff required 24-hour attendant care from June 30, 2001 until February 20, 2004, at which time he recommended that plaintiff could be left alone and unsupervised for two hours per day to accommodate Mrs. Roberson's travel to and from work. Dr. Stroupe stated that plaintiff needed adult supervision due to his forgetfulness, but that he did not require skilled nursing care or help with the activities of daily living. He opined that plaintiff's attendant care person would not need to be in constant contact with plaintiff, but would need to be in a position to check on plaintiff frequently.
7. Dr. Adland testified that plaintiff has memory difficulties, brittle diabetes, poor judgment, and that there was a question regarding his ability to be on his own for substantial periods of time. Dr. Adland did not change the recommendations he received from Dr. Stroupe and he did not perform an independent analysis of plaintiff's attendant care needs. Dr. Adland did testify that there was no reasonable likelihood that plaintiff would improve over time, and no reason to believe that there should be a reduction in plaintiff's current amount of attendant care. Additionally, Dr. Adland clarified that plaintiff's need for attendant care is not due to his depression, but is due to his cognitive problems.
8. Plaintiff was evaluated by neuropsychologist Dr. Kristine Herfkens on October 17, 2001, September 9, 2003, and August 3, 2005. As of October 17, 2001, Dr. Herfkens stated that plaintiff suffered most from deficits in the areas of attention and concentration, memory and executive function, and she diagnosed him with depression. Dr. Herfkens stated that plaintiff needed supervision 24-hours per day but was provided only 11 hours per day Monday through Friday. She testified that plaintiff could, at that time, stay alone for short periods of time, but that he was at risk for "judgment accidents" if unsupervised for any length of time. Plaintiff was not in need of skilled nursing, but due to his inability to make independent decisions, he needed the type of supervision a young child requires.
9. By September 9, 2003, Dr. Herfkens noted that plaintiff had experienced improvement in his depression and his auditory attention. Plaintiff also had some improvement in his problem-solving abilities. Dr. Herfkens opined that plaintiff needed help maintaining control over his medications, diabetes, and making sure that he ate properly. Plaintiff did not require someone to watch him constantly, but required that someone remain in the vicinity in case he ran into a problem. Dr. Herfkens further stated that plaintiff could be alone for 30 to 45 minutes per hour so long as he had someone to check on his activities at those intervals.
10. By August 3, 2005, Dr. Herfkens found plaintiff had continued to make some mild functional improvements and his memory continued to strengthen. Accordingly, Dr. Herfkens opined that plaintiff needed less supervision than he did previously and could be alone from 45 to 50 minutes per hour. She reiterated that plaintiff's primary need was for someone to be available should he get hurt or make a mistake and to generally monitor plaintiff to protect him from episodes of poor judgment.
11. Dr. Herfkens opined that during the time she treated plaintiff, he did not require skilled nursing care, but that he did require supervision. Dr. Herfkens stated that the number of hours of care was not as critical as the kind of availability of the assistance. Dr. Herfkens did not feel that a lot of dependent care would be counter-productive for plaintiff. In response to a question regarding the type of care available to plaintiff in Person County, Dr. Herfkens stated that, "I do believe that the — that it would be far preferable for [plaintiff] to have a higher level of care than he actually needs than to have none at all." She clarified that,
 In a perfect world, somebody like Mr. Roberson would have had a more skilled person in that position, would not have had a CNA but, in fact, would have had a — a brain injury specialist. But in the absence of that, I think a step down is a — a CNA or somebody who has a little bit of medical background.
Dr. Herfkens felt that plaintiff's wife could provide this type of care for plaintiff, given some education and support.
12. On August 25, 2005, plaintiff was evaluated by neuropsychiatrist Dr. C. Thomas Gualtieri. Dr. Gualtieri opined that plaintiff needed supervision by a responsible adult, primarily to monitor where plaintiff was and how he was doing. Dr. Gualtieri elaborated that he preferred patients to use their family and community rather than an aide. Although he stated that, "I think attendant care is counter-productive for someone who is struggling for-for independence," Dr. Gaultieri felt that plaintiff "needs to be in safe places that are presided over by intact people all the time."
13. Kathleen Wickizer, a premium product manager with Southern Rehabilitation Network who is nationally certified in life care planning, testified regarding plaintiff's life care plan that she prepared. Ms. Wickizer stated that plaintiff lives in rural Person County and there are a limited number of attendant care vendors in the area. As a result, Ms. Wickizer also looked at vendors in Durham County, where plaintiff's current CNA services are located. Ms. Wickizer testified that in 2005, the usual and customary rate of attendant care by a certified nursing assistant was $17.84 per hour for weekdays and $18.00 per hour for weekends, while in 2002 and 2003, the rate was between $15.00 and $15.50 per hour. However, Ms. Wickizer testified that the rates she provided were agency rates, and that she did not have rates for individuals who provide those same services. Ms. Wickizer agreed that the hourly rate charged by agencies includes overhead and other costs, while the rates for an individual who provided the service might be substantially less. In addition, she did not have rates for unskilled sitters in Person County. Ms. Wickizer testified that without looking at actual cost of services, she would expect the cost for an unskilled attendant to be "significantly less than the $15 an hour figure."
14. The Full Commission gives greater weight to the testimony of Drs. Stroupe and Adland concerning the extent of attendant care needed by plaintiff. Based upon the expert medical testimony of record, from June 30, 2001 through April 2, 2004, plaintiff required 16 hours of attendant care per day, excluding eight hours per day for sleeping. During this time period, defendants provided 11 hours of attendant care per day during the weekdays and no attendant care on weekends. Therefore, from June 30, 2001 though April 2, 2004, plaintiff required and was provided by his wife an additional five hours per day during weekdays and 14 hours a day on weekends. After April 2, 2004, excluding eight hours a day for the time plaintiff is asleep and the two hours a day that plaintiff can be left alone, the Commission finds that plaintiff requires supervisory care for 14 hours per day. Defendants are currently providing attendant care to plaintiff from an outside agency for seven hours a day, five days a week. Therefore, plaintiff needs unskilled care for an additional seven hours a day during the weekdays and for 14 hours a day on weekends.
15. Following plaintiff's June 4, 2001 injury by accident, an inspection of defendant-employer's premises was conducted by the North Carolina Department of Labor Division of Occupational Safety and Health (OSHA) in response to a complaint that alleged that in the previous four years, three employees had fallen through the roof and incurred injuries.
16. Ronald Wells, District Supervisor for OSHA, discussed the OSHA report, which found that the violations were "high-severity, medium probability." The report noted that plaintiff was instructed to go onto the roof, which was 18 feet high, in order to clean the gutters. The skylight and roof were not equipped with standard guardrails or any other type of fall protection, pursuant to statute. The report found, "[t]he hazard exists than an employee working on the roof would lean over too far in cleaning out the gutters and inadvertently fall, suffering fractures and lacerations." The report also found that,
 Mr. Gil Stoval, General Manager, knew of the danger with the skylights in that he warned his employees before they went on the roof, and should have, with the exercise of reasonable diligence, properly guarded the skylights and roof edge, provided the employees with personal fall protection systems, or directed the employees to work off ladders.
In fact, on two other occasions, employees stepped on skylights, cracking the fiberglass surface; however, OSHA was unable to substantiate the allegation that other employees had previously fallen through defendant-employer's roof.
17. Based upon the inspection, OSHA issued a Citation and Notification of Penalty to defendant-employer on June 28, 2001. The citation alleged a violation of the Occupational Safety and Health Act of North Carolina and/or the standards and regulations promulgated therein. The citation was issued for violations of two statutes, 29 CFR 1910.23(a)(4) and29 CFR 1910.23 (c)(1), both of which were deemed "serious" violations pursuant to N.C. Gen. Stat. § 95-138. Following an informal conference, the citation was modified to reduce the penalty from $700.00 to $350.00 and defendant-employer agreed to take the abatement action of no longer allowing employees on the roof of the premises, which was deemed acceptable by OSHA.
18. The Full Commission finds that the greater weight of the evidence shows that defendant-employer's failure to come into compliance with OSHA standards constitutes a "willful" failure of the employer to comply with statutory requirements or lawful order of the Commission.
19. Defendants have not defended this action without reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On June 4, 2001, plaintiff suffered an admittedly compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to all medical expenses, including rehabilitative services, incurred or to be incurred, as a result of his compensable injury, for so long as such examinations, evaluations and treatments, may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§97-2(19); 97-25.
3. In London v. Snak Time Catering, 136 N.C. App. 473, 525 S.E.2d 203
(2000), plaintiff suffered a brain injury in an admittedly compensable accident. Plaintiff was able to perform some functions of daily living on his own, but required 24-hour attendant care. In addition, attendant care workers required a minimum of eight hours per day to come to plaintiff's home. The Court of Appeals affirmed the Commission's award of compensation to plaintiff's wife for attendant care services for eight hours per day, seven days per week. The Court also affirmed payment for outside care when plaintiff's wife needed assistance, at the same hourly rate paid plaintiff's wife "or at a reasonable other hourly rate if not available at $6 per hour." Id. at 478, 525 S.E.2d at 207.
4. In the case at bar, plaintiff is able to perform some functions on his own, but requires attendant or supervisory care 14 hours per day. In addition to the attendant care services already provided by defendants, plaintiff's wife has provided plaintiff attendant or supervisory care services since June 30, 2001. Although plaintiff did not seek prior Commission approval of the provision of family attendant care, Chapter 14 of the Workers' Compensation Medical Fee Schedule allows approval of past family attendant care in "unusual cases where the treating physician certifies it is required. . . ." In this case, plaintiff's treating physicians, Drs. Stroupe, Adlund, Herfkens, recommended around-the-clock attendant care beginning in 2001 and in 2004 allowed a two-hour period each day during which plaintiff could be left unsupervised.
5. Defendants provided 11 hours of attendant care per day Monday through Friday from June 30, 2001 through April 2, 2004 and for seven hours per day Monday through Friday from April 2, 2004 through the time of the Deputy Commissioner's hearing and continuing. During those periods when attendant care was not being provided, plaintiff's wife provided attendant care for which she should be compensated. Therefore, plaintiff is entitled to payment of attendant care for five hours per day Monday through Friday and for 16 hours per day on weekends from June 30, 2001 through April 2, 2004 and for seven hours per day Monday through Friday and for 14 hours per day on weekends from April 2, 2004 through the time of the Deputy Commissioner's hearing and continuing. N.C. Gen. Stat. § 97-2(19); London v. Snak Time Catering, supra. For the ongoing attendant care, any care provided by a CNA shall be paid at the market agency rate. The record does not contain sufficient evidence of the market hourly rate for an unskilled sitter or for plaintiff's wife.
6. Plaintiff is entitled to total disability compensation in the amount of $300.00 per week beginning June 4, 2001 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29. This compensation has been and is currently being paid to plaintiff by defendants.
7. N.C. Gen. Stat. § 97-12 provides for a 10% increase in compensation when the injury suffered by the employee is caused by the willful failure of the employer to comply with any statutory requirement or lawful order of the Commission. In Jenkins v. Easco Aluminum,165 N.C. App. 86, 598 S.E.2d 252 (2004), the Court of Appeals defined "willful" as used in N.C. Gen. Stat. § 91-12 as, "when there exists a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, a duty assumed by contract or imposed by law." In Jenkins, an employee was injured when a safety guard on a press break machine was left off, in violation of OSHA requirements. Evidence showed that defendant-employer had been informed by at least one other employee of the problems with the press brake machine. The Court of Appeals found this notice to the employer sufficient to satisfy the "willful" requirement of N.C. Gen. Stat. § 97-12 and to award the 10% additional compensation.
8. In the case at bar, defendant-employer knew or should have known of the dangerous conditions and should have exercised reasonable diligence to properly guard the skylights and roof edge, provide employees with personal fall protection systems, or to direct employees to work from ladders. Thus, the greater weight of the evidence is sufficient to establish that the violations were "willful" within the meaning of N.C. Gen. Stat. § 97-12 in that the numerous cited violations clearly manifest a "deliberate purpose not to discharge" defendant-employer's safety obligations. Beck v. Carolina Power Light Co.,57 N.C. App. 373, 383-84, 291 S.E.2d 897, 903(1982), citing Brewer v.Harris, 279 N.C. 288, 297, 182 S.E.2d 345, 350 (1971). Therefore, plaintiff is entitled to a 10% increase in the compensation awarded above due to defendant-employer's willful violations of OSHA safety standards. N.C. Gen. Stat. § 97-12; Jenkins v. Easco Aluminum,supra.
9. The defense of this claim was reasonable and not stubborn, unfounded litigiousness and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v.Mountain Breeze Restaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney's fee approved below, defendants shall continue to pay plaintiff total disability compensation at the rate of $300.00 per week beginning June 4, 2001 and continuing until further order of the Commission.
2. Defendants shall pay a 10% increase in the compensation awarded plaintiff in paragraph 1 of this award, which shall be paid by increasing by 10% the weekly payments due.
3. Defendants shall provide the level of attendant care recommended by plaintiff's treating physicians, including payment of attendant care for five hours per day Monday through Friday and for 16 hours per day on weekends from June 30, 2001 through April 2, 2004 and for seven hours per day Monday through Friday and for 14 hours per day on weekends from April 2, 2004 through the time of the Deputy Commissioner's hearing and continuing. For the ongoing attendant care, any care provided by a CNA shall be paid at the market agency rate. Because the record does not contain sufficient evidence of the market hourly rate for an unskilled sitter or for plaintiff's wife, the parties shall stipulate to an appropriate hourly rate or may request Commission approval to take depositions or submit other evidence concerning an hourly rate for unskilled attendant care.
4. Defendants shall pay all related medical expenses, including rehabilitative services, incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability.
5. Plaintiff's request for attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1 must be and is hereby DENIED.
6. Defendants shall pay the costs.
This 20th day of November, 2006.
 S/__________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/__________________ THOMAS J. BOLCH COMMISSIONER
 S/__________________ CHRISTOPHER SCOTT COMMISSIONER